E. W. JEMISON and Charles W. Plash and Evelyn Plash Hooks, as Co-executors of the last will and testament of Laura K. Plash, deceased, Libelants,

v.

THE Dredge DUPLEX, her engines, boilers, tackle, apparel, etc., and its owners, The Great Lakes Dredge & Dock Company, Respondents-Petitioner, United States of America, Respondent-Impleaded, Petitioner, Standard Dredging Corporation, Respondent-Impleaded.

CITY OF MOBILE, a municipal corporation, as owner of a dock located on the Mobile River, at Mobile, Alabama, Libelant,

v.

THE Dredge DUPLEX, her engines, boilers, tackle, apparel, etc., and its owners, The Great Lakes Dredge & Dock Company, Respondents-Petitioner, United States of America, Respondent-Impleaded, Petitioner, Standard Dredging Corporation, Respondent-Impleaded.

Arwood H. GINN, Libelant,

v.

GREAT LAKES DREDGE & DOCK COMPANY, Respondent-Petitioner, United States of America, Respondent-Impleaded, Petitioner, Standard Dredging Corporation, Respondent-Impleaded.

Nos. 2590, 2596, 2619.

United States District Court
S. D. Alabama, S. D.
July 31, 1958.

**948**

R. B. Wilkins, of Cunningham & Wilkins, Mobile, Ala., for libelants.

Francis H. Inge, of Inge & Twitty, Mobile, Ala., Deutsch, Kerrigan & Stiles, New Orleans, La., for dredging companies.

Ralph Kennamer, U. S. Atty., Mobile, Ala., Lawrence F. Ledebur, Atty., Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for the United States.

DANIEL HOLCOMBE THOMAS, District Judge.

These suits, consolidated for trial, grew out of damage done to wharves bordering the Mobile River during a dredging operation.

### Findings of Fact

1. On December 9, 1955, respondent-impleaded, United States of America, entered into a contract with respondent-impleaded, Standard Dredging Corporation, to deepen the ship channel of the Mobile River. The latter entered into a sub-contract with respondent, Great Lakes Dredge & Dock Company, under the provisions of which the Dredge Duplex, owned and operated by Great Lakes, was to do a portion of the work.

2. On September 17, 1956, the Duplex was dredging in the vicinity of the foot of Eslava Street in the City of Mobile under and pursuant to the provisions of the foregoing contracts. She had been furnished by the United States with plans and specifications which were a part of the prime contract. She was complying with their requirements in all particulars. A government inspector was on board to ensure such compliance.

3. Libelants, E. W. Jemison et al., and the City of Mobile, own adjacent wharves at the foot of Eslava Street. On September 17, 1956, libelant, Arwood H. Ginn, was operating a marine fuel filling station on the City wharf.

4. Pilings under the wharves extended to a depth of 20 feet below the surface of the water, while the government specifications for the dredging called for a depth of 26 feet of water at these wharves. Employees of the United States Corps of Engineers who planned the project, and prepared the specifications for carrying it out, could and should

have obtained, but apparently did not in fact obtain, this information in advance of establishing the dredging line in the area.

5. The dredge had been employing a technique called box-cutting in which her cutter-head, which has a width of eight feet, swung its shoreward edge ten feet over the dredging line, undercutting the bank, which then slid into the excavation, forming the side-slope required by the specifications. This technique is proper and customary, and was contemplated under the plans, drawings and specifications of the United States Corps of Engineers.

6. Before entering the area of the river along the wharves, as she worked her way south past Eslava Street, the dredge approached the City wharf which lies north of the Jemison wharf. While her cutter-head was still some 60 feet north of the northeast corner of the City wharf, cutting along the line designated in the specifications, the wharves subsided with attendant damage. Libelant Ginn's marine fuel filling station consisted of two gasoline pumps located on the City wharf. When the City wharf subsided, the two gasoline pumps were caused to lean considerably toward the water.

7. Before proceeding further with the undercutting of the bank, the Duplex secured permission from the United States to swing her cutter-head eastward, thus avoiding further damage to the wharves. The dredge was thus allowed to deviate from the required line and avoid the wharves. The dredge never worked in close proximity to the wharves.

8. After the subsiding of the wharves, soundings were taken at the wharves, and profile charts were made by the United States and Great Lakes working independently. Their findings agree, and show that the dredge did not excavate as close to the wharves as the specifications required.

9. Libelants, Jemison et al. and the City of Mobile, filed libels *in rem* and *in personam* in this district against the Dredge Duplex and Great Lakes. Libelant, Ginn, filed a libel *in personam* against Great Lakes in the United States District Court for the Eastern District of Louisiana, which action was transferred by consent to this district. Great Lakes filed petitions in each action to implead the United States, under the 56th Admiralty Rule, 28 U.S.C.A., alleging that any liability for damage to the wharves was due to erroneous specifications furnished by the government with its contract. Motions to dismiss the petitions of impleader for want of admiralty jurisdiction, were filed by the United States. Dismissal of the petitions was denied; and the United States then impleaded Standard Dredging Corporation under the 56th Rule, alleging that it failed to supervise and properly inspect the work area, and was required to indemnify the United States under its contract with the latter.

10. Standard was not at the scene and, having employed Great Lakes, a sub-contractor, whose dredge performed its work in compliance with specifications, and in a careful and prudent manner, was guilty of no fault.

### Damages

In Case No. 2596, it was stipulated between the parties that the cost of repair to the City of Mobile wharf was $3,000. There was no agreement as to depreciation. Mr. Cady, a marine surveyor and consultant, placed the depreciation of the wharf, prior to the damage complained of, at 60%. Mr. Yeager, an expert employed by the City of Mobile, placed the depreciation at about 40%. The court therefore finds that the depreciation amounted to 50%, and a judgment will be awarded in favor of the City of Mobile in the amount of $1,500.

In Case No. 2590, it was stipulated between the parties that the cost of repair of the Jemison wharf was in the amount of $18,977, less depreciation. No stipulation was entered into as to the amount of depreciation. Mr. Cady, referred to above, estimated the depreciation of the under-structure of the Jemison wharf at approximately 20%. This

wharf consisted of a cement slab resting on solid ground, supported by a bulkhead consisting of wooden piling on the river side. Mr. Cady would depreciate eight of these piling in the amount of 5% and the remaining fourteen at 50%. The piling were twenty-five feet long, and had these piling been entirely new, the dredging operation would have caused the piling to be of no lateral support to the under-structure of the cement slab. (Finding of Fact No. 4.) The figure of $18,977 (cost of repairs) contemplates the repair of the wharf by use of interlocking sheet steel piling of sufficient length to properly support the under-structure of the wharf, which in effect would put the Jemison wharf in far better condition than when originally constructed. There is no mathematical formula by which proper depreciation can be reached in this matter. The court finds that an over-all depreciation of 20% would be equitable in this matter. A judgment in the amount of $15,181.60 will be entered in this case.

In Case No. 2619, after the damage to the City wharf and the attendant damage to his gasoline pumps, Mr. Ginn continued to operate his marine fueling station until he was ordered to discontinue this operation or repair the leaning pumps. It would have been impractical to make necessary repairs, consequently, on February 27, 1957, he discontinued this operation. He also operated a restaurant at the foot of Eslava Street, immediately west of the City wharf. The physical structure of the restaurant had not been affected by the subsiding of the wharf. He continued to operate this restaurant until September 17, 1957, at which time he sold his entire business. The testimony discloses that the gallonage of his marine fuel filling station did not fall off from the time of the damage complained of until he discontinued the operation in February. The evidence further discloses that the patronage of Ginn's restaurant, to a large extent, came from the boats which fueled at his marine filling station. It is difficult, if not impossible to calculate Ginn's damage by any mathematical formula, and there was no stipulation as to the amount of damage suffered by Ginn. After due consideration the court finds that the sum of $750 would be just compensation for the loss suffered by the libelant Ginn.

## Conclusions of Law

■ 1. This court has jurisdiction of the libels herein, and of the petitions of impleader ancillary thereto involving the same facts, and joint trial of all causes of action was appropriate. Cf. Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A. (The Cali), 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206, 1950 A.M.C. 1089; St. Louis-San Francisco Railway Co. v. United States, 5 Cir., 1951, 187 F.2d 925; Russell, Poling & Co., v. United States (Russell-Poling No. 29-Tug Corporal U. S. Buoy Service), D.C.S.D.N.Y., 151 F.Supp. 11, 1957 A.M. C. 1275; Dupuis v. Drytans, Inc., D.C. S.D.N.Y.1957, 150 F.Supp. 436; Hidick v. Orion Shipping & Trading Co., D.C.S. D.N.Y.1957, 152 F.Supp. 630; The Nonpareil, D.C.S.D.N.Y., 1924 A.M.C. 312; The Cotati, D.C.S.D.N.Y., 2 F.2d 394, 1924 A.M.C. 149.

■ 2. Respondent-impleaded, United States of America, was guilty of negligence in failing to secure adequate information as to the wharves at the foot of Eslava Street in Mobile, while planning the project, and in preparing specifications the carrying out of which was the proximate cause of subsidence of the wharves.

■ 3. Respondent, Great Lakes Dredge & Dock Company, and respondent-impleaded, Standard Dredging Corporation, used due care and performed their work in a careful and prudent manner, and in accord with the specifications. There is no merit in the contention of the United States that Standard is liable to it for breach of an implied warranty of workmanlike service.

■ 4. The contract between respondent-impleaded, United States of America, and respondent-impleaded, Standard Dredging Corporation, and the

specifications to the contract do not require that either the dredging contractor or the United States shall assume liability for negligence of the other. Hence, the question whether the United States may validly stipulate against liability for its own negligence need not be decided: "An undertaking to indemnify against the indemnitee's own negligence will not be inferred from doubtful language but must be clearly and unequivocally expressed." Turner Construction Co. v. W. J. Halloran Steel Erection Co., 1 Cir., 1957, 240 F.2d 441, 444.

5. Respondent-impleaded, United States of America, is directly liable to libelants under the 56th Admiralty Rule, as prayed in the petitions of impleader filed by respondent, Great Lakes Dredge & Dock Company. See Skupski v. Western Navigation Corp., D.C.S.D.N.Y., 113 F.Supp. 726, 1953 A.M.C. 1441; The Peerless, D.C.S.D.N.Y., 2 F.2d 395, 1923 A.M.C. 236; Hidalgo Steel Co. v. Moore & McCormack Co. (Barge Shamrock No. 12), D.C.S.D.N.Y., 298 F. 331, 1923 A.M.C. 1203; cf. Evans v. New York & P. S. S. Co., D.C.S.D.N.Y.1906, 163 F. 405.

6. The oral motion to dismiss the consolidated cases, made by the United States, on the grounds that the dredging operation constituted a discretionary function within the meaning of 28 U.C.S.A. § 2680(a), and therefore the court was without jurisdiction, is not well taken. Discretion within the meaning of the Tort Claims Act was exercised when it was decided that the ship channel in the Mobile River should be deepened. But in drawing the plans and specifications pursuant to achieving this improvement, the United States Engineers were not given *carte blanche* to draft plans and specifications for the dredging operations in negligent disregard for the rights of property owners along the shore. When acts of negligence are committed at the *operational level*, the government is no longer immune from suit. "Operational negligence" is actionable negligence. Indian Towing Co., Inc., v. United States, 5 Cir., 211 F.2d 886; Id.,

1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Eastern Air Line, Inc., v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, Id., 1955, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796; Dahlstrom v. United States, 8 Cir., 1956, 228 F.2d 819; Fair v. United States, 5 Cir., 1956, 234 F.2d 288.

Judgments in accordance herewith will be this day entered.