AERO ENTERPRISES, INC., and Delores Senn, Individually and as Next Friend for John Edward Senn and Kathy Anita Senn, Minors, Plaintiffs,

v.

AMERICAN FLYERS, INC., a Corporation, and The United States of America, Defendants.

Joanne Mae SCHULTETUS, a widow, Plaintiff,

v.

AERO ENTERPRISES, INC., a Corporation, and The United States of America, Defendants.

Civ. A. Nos. 3658, 3628.

United States District Court
N. D. Texas,
Fort Worth Division.
Nov. 3, 1958.

Harris, Anderson, Henley & Rhodes, Dallas, Tex., for plaintiff Schultetus and American Flyers, Inc.

McDonald, Sanders, Nichols, Wynn & Ginsburg, Fort Worth, Tex., for plaintiff Senn.

Crowley, Wright, Miller & Garrett, Fort Worth, Tex., for Aero Enterprises, Inc.

Heard L. Floore, U. S. Atty., Clayton Bray, A. W. Christian, Asst. U. S. Attys., Fort Worth, Tex., W. A. Crawford, Jr., Regional Atty., Civil Aeronautics Administration, Washington, D. C., for the United States.

DANIEL HOLCOMBE THOMAS, District Judge.

On April 9, 1957, around the noon hour, with "visibility unlimited", a Cessna 170 aircraft and a Cessna 140 aircraft collided over Meacham Field, Fort Worth, Texas. The planes were owned and operated by civilian flying schools, and each plane was occupied by an instructor and a student. All occupants were killed. In order that the factual situation may be

thoroughly understood, a diagram of the runways, control tower, and adjacent structures, is reproduced below, together with air traffic pattern of Runway 13.

GLOBE
LABORATORIES

SINCLAIR
REFINERY

TRINITY CEMENT
COMPANY

242

RUNWAY 13
FORT WORTH MUNICIPAL AIRPORT
MEACHAM FIELD

TAXI PATTERN

AIR TRAFFIC PATTERN

SERVICE AREA ONLY.

PARKING AREA

TAXI ROUTE FOR TAKE OFF

TAXI ROUTE AFTER LANDING

TETRAHEDRON

ENTER

LEAVE

600'

600'

600'

400'

1000'

1000'

THE CIRCULAR PATTERN MAY BE USED BY AIRCRAFT
THAT FIND IT DIFFICULT BECAUSE OF THEIR SPEED
OR FLYING CHARACTERISTICS TO COMPLY WITH
THE SMALLER RECTANGULAR PATTERN.

The Cessna 140 trainer was owned and operated by Aero Enterprises, Inc., and was occupied at the time of the collision by instructor Senn and student pilot Chambers. The Cessna 170 trainer, owned and operated by American Flyers, Inc., was occupied at the time of collision by instructor Schultetus and student pilot Rattunde.

The widow of instructor Schultetus, on behalf of herself and minor child, is suing Aero Enterprises, Inc., for the alleged negligence of its employee, instructor Senn; and is also suing the United States, under the Federal Tort Claims Act, for the alleged negligence of the employees of Civil Aeronautics Administration, Department of Commerce, the agency of the United States operating the control tower at the field.

The widow, children, and partially dependent mother of instructor Senn, and Senn's employer (Aero Enterprises) are suing American Flyers, Inc., for the alleged negligence of latter's employee, instructor Schultetus; and are also suing the United States for the alleged negligence of its employees in the control tower.

In addition to attacking jurisdiction, the United States has filed cross-claims in both suits, and appropriate cross-claims have also been filed by the companies operating the respective planes. A compensation insurance carrier has intervened.

Jury trial was waived by all parties entitled thereto, and the consolidated suits came on for hearing before the court.

### General Findings of Fact

At the time of the collision, Aero Enterprises, Inc., and American Flyers, Inc., were operating flight training schools at Meacham Field, which is owned by the City of Fort Worth, Texas. (Prior to the development of Carter Field, Meacham had been the commercial landing field at Fort Worth). The control tower at Meacham is operated by the Civil Aeronautics Authority, an agency of the United States. The special rules and regulations applicable at Meacham are established by the management of the Field (Aviation Director of the City of Fort Worth) with the assent of the Civil Aeronautics Board, an agency of the United States.

The complement of the control tower at Meacham is three men. At noon on April 9, the chief operator was at lunch. The operator next in rank was in charge of the tower and was handling the air traffic, including clearings for departures and landings. The second man on duty was handling the ground traffic. The third man on duty had just come to work in the tower that day and was observing. (He had had previous experience in control tower operations.) The tower was equipped with the usual devices, including two-way radio and light signal guns. The primary function of the control tower is to direct traffic at the airport so as to prevent accidents and to furnish information to that same end.

The planes involved in the collision were dual control planes. It was stipulated that any negligence on the part of the student pilot in either plane would be imputable to his instructor, which, in turn, would be imputable to the respective employer. Senn was a licensed pilot and a licensed instructor, employed on a part-time basis by Aero Enterprises and regularly employed as an inspector at the Convair plane factory in Fort Worth. He had been operating aircraft on and around Meacham Field for about two years. The student accompanying him had accumulated only a few flying hours. Schultetus was a licensed pilot with considerably less experience than Senn, but he had served in the Air Corps during World War II. The student accompanying Schultetus had received his primary flying license.

Around noon on April 9, when Senn reported to Aero Enterprises, he was assigned to take student pilot Chambers up in the Cessna 140 (N2098N) to practice landings and take-offs. From the time the N2098N was cleared by visual light signal for the take-off on Runway 13 until its collision with the Cessna 170 (a matter of minutes), its

pattern was the counter-clockwise pattern prescribed. Its altitude was 600 feet above ground level, or 1,300 feet above sea level, also as prescribed. The plane's radio equipment was not in operation; but there was no requirement that it be in operation, as the flight was scheduled solely as a visual training flight.

Shortly prior to the collision, another Cessna 140 (22 Victor) had been cleared for take-off on Runway 13, and had become airborne. It was following the N2098N in the traffic pattern for Runway 13, and both planes were on the "downwind leg".

The Cessna 170 (also known as N3859V or 59 Victor) had been cleared to practice instrument landing approaches on Runway 17, the usual runway for practicing such landings. The plane was equipped with a two-way radio in operation at all pertinent times. Instrument landing approach practice requires that the visual range of the student be restricted to simulate "blind-flying" conditions. This restriction is accomplished by placing an orange-tinted, somewhat opaque, shield of amber polaroid plexiglass behind the windshield in the cockpit on the side (left) occupied by the student, and further by having the student don dark goggles with "blinders" on the sides. The vision of the instructor is not thus restricted, but is somewhat hindered on the left by the presence of the orange shield. In practice instrument approach procedure, even though the trainer plane is in all respects on course, it does not necessarily have to land, but may transmit "missed approach" to the control tower, and continue in flight as it executes the usual "missed approach" procedure. As the Cessna 170 (59 Victor) came toward Meacham Field from the north in line with Runway 17 on a practice instrument landing, it reported the low cone (over the range station) to the control tower.

This is the description of the events immediately preceding the accident, as given by Mr. Ellis, the tower operator in charge at the time of collision:

"The Court: Mr. Ellis, relate to me, as best you can, the communications had between you and the 170 from the time he approached the low cone until the collision. Now please give them in proper sequence and the conversations as best you can.

"A. Cessna 5-9 Victor reported the low cone or range station. My reply was 'Roger, 5-9 Victor. Clear for practice low approach. Traffic, Cessna 140 east of the field downwind from runway 1-3.' The aircraft continued to approximately a mile and a half north of the field. At that time I called 5-9 Victor and my approximate statement was, '5-9 Victor, traffic, Cessna 140 downwind east of the field for runway 1-3. Do you have him in sight?' 5-9 Victor's reply was, 'Roger, have him in sight.' I continued to observe the aircraft, and when 5-9 Victor was approximately over the middle marker he started a climbing left turn at the same time transmitted, '5-9 Victor, missed approach.' I replied, '5-9 Victor, traffic, Cessna 140 crossing in front of you.' His reply was, '5-9 Victor, Roger.'

"I observed the two aircraft until the 170 appeared to have passed the 140, and then I turned my attention to the Bonanza" [a private plane approaching from the west].

"The Court: Go ahead.

"A. I cleared the Bonanza to land when Mr. Selby [the new assistant in the tower] called my attention to the fact that the two aircraft had collided."

Other witnesses testified that the Cessna 170 (5-9 Victor) approached the field from the north in a gradual descent, flying at an altitude of approximately 400 feet above ground level, which is correct for low approach, and at a speed of approximately 90 m. p. h., in the control pattern for Runway 17. The Cessna 140 (N2098N or 98N) was flying at an altitude of approximately 600 feet above ground level in the control pattern for Runway 13, and was approaching the field in level flight from the southeast on the "downwind leg." When the Cessna 170 (59 Victor) was approximately

over the middle marker [having transmitted "missed approach"], it began a climbing left turn at an angle of approximately 15° in a clockwise direction. (The general pattern for the field was counterclockwise.) There was no rule against such a maneuver, if traffic conditions permitted, and it was often executed. The general pattern for "missed approach" procedure is to start climbing to an altitude of 2,000 feet on south course within 20 miles of the field. There was testimony that in actual practice certain buildings surrounding the airport made it necessary to start an early climb. As the Cessna 170 (59 Victor) gained altitude in its climb, it appeared to eyewitnesses that it would cross the path of, if not hit, the Cessna 140 (N2098N). The latter plane was then approaching a point in level flight approximately a mile north of Meacham Field and was proceeding in a northwesterly direction parallel to Runway 13, preparatory to landing on that runway. As the planes came together, the Cessna 170 (59 Victor) struck the Cessna 140 from beneath on the right side. The right wing of the Cessna 170 fell from the plane, and the plane itself plummeted to earth almost at the exact spot of the collision and caught fire. The Cessna 140 remained airborne for a few seconds, and then plunged to earth, landing upside down.

Instructors, trainees, and control tower personnel were all charged with the duty of visually watching out for the air traffic around and upon the field, and with knowledge of the rules and regulations governing air traffic at the field. There was much testimony as to what could have been done or should have been done to avoid the accident, and particularly as to whether or not some further warning signal should have been given by the control tower, both to the Cessna 140 and the Cessna 170, and whether or not, at the speed of the planes, the signal would have been effective. Any signal to the Cessna 140 (N2098N) must have been a light signal, but no attempt was made by the control tower to use the light gun prior to the accident.

Special Findings as to Negligence

From the foregoing facts, the court makes the following special findings:

At all relevant times subsequent to the clearance of the Cessna 170 (59 Victor) for low frequency instrument approach landing on Runway 17 immediately prior to the collision, there were two (or more) Cessna 140 aircraft on the downwind leg for Runway 13.

The operator in charge of the control tower cleared the Cessna 170 (59 Victor) aircraft to practice an instrument approach landing on Runway 17 with knowledge that there were other aircraft in the regular prescribed flight pattern for landing on Runway 13.

The operator in charge of the control tower failed to inform the Cessna 170 aircraft by radio of the presence of more than one Cessna 140 aircraft which were on a converging or collision course with the Cessna 170 (59 Victor); and failed to identify which Cessna 140 he was referring to in directing any warnings given to the Cessna 170 (59 Victor).

The operator in charge failed to instruct the Cessna 170 aircraft by radio to alter its course so as to avoid the possibility of collision with aircraft in the traffic pattern for Runway 13.

The operator in charge failed to give a visual red light signal to direct the Cessna 140 aircraft (N2098N) to give way to the Cessna 170 after the Cessna 170 had been cleared for a simulated instrument low approach landing; and failed to transmit a visual general warning signal to the Cessna 140 aircraft (N2098N) to warn it of the presence of the Cessna 170 (59 Victor), after he (the tower operator) had observed the aircraft were on a converging or collision course.

The operator in charge failed to maintain proper control over the two aircraft in question so that each would be properly spaced with regard to the traffic

control pattern in use for Runway 13; and the other control tower operators, observing the planes in question on a converging or collision course, failed to warn the chief control operator or either aircraft by visual light signal or radio of the imminence of collision.

Each of the acts and omissions set forth above occurred while the employees in the control tower at Meacham Field were employees of the United States of America and were acting in the scope and course of their employment.

Each of the foregoing acts and omissions constituted negligence on the part of the control tower operators and such negligence was the proximate cause of the collision of the Cessna 170 (59 Victor) and the Cessna 140 (N2098N), and therefore the proximate cause of all damage shown by the evidence in this case.

At the time of the collision and at all relevant times prior thereto, the Cessna 140 (N2098N) aircraft was on a proper course and at a proper altitude on the downwind leg of the established traffic pattern of Meacham Field for landing on Runway 13.

At the time of the collision and at all relevant times prior thereto, aircraft 170 was on a proper course and at a proper altitude after it was given radio clearance by the control tower personnel; aircraft 170 was executing a standard and proper maneuver at the time of the collision, after notifying the control tower that it had missed approach; and at the time of such maneuver the occupants of aircraft 170 were facing directly into a bright sun.

There is not sufficient evidence to overcome the presumption that the deceased operators Schultetus and Senn exercised ordinary care for their own safety. The court further finds that there was no negligence on the part of either the operator of the Cessna 170 (59 Victor) aircraft or of the Cessna 140 (N2098N) aircraft.

## Conclusions of Law

1. The court has jurisdiction of the respective causes of action against the United States of America in that said causes of action arise under and by virtue of Section 1346 and Sections 2671–2680 of Title 28 U.S.C.A.

2. The court has jurisdiction of the private litigants in Civil Action No. 3628 under Section 1332 (and Section 1331), Title 28 U.S.C.A. The court has jurisdiction of the private litigants in Civil Action No. 3658 under Section 1331, Title 28 U.S.C.A.

3. The acts and conduct of the three control tower operators at Meachem Field, Fort Worth, Texas, at the time of and immediately preceding the collision in question, do not fall within the exceptions as to liability of the Government set forth in Title 28, Section 2680, sub-section (a), U.S.C.A. Eastern Air Lines, Inc., v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62; Id., 1955, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796; Indian Towing Co., Inc., v. United States, 5 Cir., 211 F.2d 886; Id., 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. (Recently cited in Jemison v. The Duplex, D.C.1958, 163 F.Supp. 947.)

4. There is a presumption in favor of the deceased pilots, Schultetus and Senn, that they were exercising ordinary care for their own safety at the time and on the occasion of said accident and no evidence was introduced sufficient to overcome said presumption. Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481.

5. The acts and omissions of the control tower operators, which the court finds to have been the proximate cause of the collision, constitute negligence of the kind and type as contemplated within Section 1346 and Section 2674 of Title 28 U.S.C.A., and accordingly the United States is liable to the plaintiffs for their damages. Eastern Air Lines, Inc., v. Union Trust Co., supra; Indian Towing Co., Inc., v. United States, supra; Jemison v. The Duplex, supra.

## Special Findings as to Damages

1. The market value of the Cessna 140 was $2,250, and the market value of the Cessna 170 was $7,800 for the

purpose of establishing property damages. These values were stipulated and admitted.

2. The funeral expenses of John Kenneth Schultetus, deceased, were $1,140.09; and the funeral expenses for John Louis Senn, deceased, were $1,522. These expenses were stipulated and admitted.

3. Plaintiffs Joanne Mae Schultetus, Douglas J. Schultetus, Richard J. Schultetus, Anna Schultetus, Delores Senn, John Edward Senn, Kathy Anita Senn, and Mrs. Madie Jane Senn, are the sole and only statutory beneficiaries of John Kenneth Schultetus and John Louis Senn, entitled to maintain and prosecute these causes of action under the provisions of and in accordance with the Texas Death Statute, Vernon's Ann.Civ.St. art. 4671 et seq.

4. It was not necessary to appoint guardians ad litem for any of the minor plaintiffs prior to the trial of this case and the entry of judgment, as each was represented by a competent next friend, and also because the apportionment of the damages awarded to plaintiffs is being made by the Court without any agreement, suggestion or recommendation from any of such plaintiffs. Roberts v. Ohio Casualty Insurance Company, 5 Cir., 256 F.2d 35.

5. The plaintiffs Richard J. Schultetus and Anna Schultetus are found not to be dependent on the deceased John Kenneth Schultetus in any manner and had no reasonable expectation of any voluntary contributions from him, and are accordingly not entitled to recover any damages herein.

6. Ohio Casualty Insurance Company paid workmen's compensation death benefits to Joanne Mae Schultetus and the minor Douglas J. Schultetus, in the amount of $7,878.63.

7. The earnings of John Kenneth Schultetus, deceased, were $5,352.88 for the year 1954, $5,538.22 for the year 1955, and $4,886.80 for the year 1956. The earnings of John Louis Senn, deceased, were $5,355.46 for the year 1954, $6,311.22 for the year 1955, and $7,878.51 for the year 1956.

8. The life expectancy of each of the deceased, as contained in the Commissioner's 1941 Standard Ordinary Mortality Table, is as follows:

| Name | Age at Time of Accident | Life Expectancy |
|------|------|------|
| John Kenneth Schultetus | 32 years | 36.01 years |
| John Louis Senn | 38 years | 30.91 years |

9. The statutory beneficiaries of the deceased John Kenneth Schultetus have been damaged by reason of his death in the sum of $60,000 which I find should be apportioned as follows: to the plaintiff Joanne Mae Schultetus the sum of $40,000, out of which the intervenor, The Ohio Casualty Insurance Company, shall recover the sum of $3,939.31; to the minor son of deceased, Douglas J. Schultetus, the sum of $20,000, out of which the intervenor, The Ohio Casualty Insurance Company, shall recover the sum of $3,939.32.

10. The statutory beneficiaries of the deceased John Louis Senn have been damaged in the total sum of $77,000, which I find should be apportioned as follows: to the plaintiff Delores Senn, the sum of $35,500; to the minor son of the deceased, John Edward Senn, the sum of $20,000; to the minor daughter of the deceased, Kathy Anita Senn, the sum of $20,000; to the surviving mother of the deceased, Mrs. Madie Jane Senn, the sum of $1,500.

11. Out of the recovery hereinabove allowed to Joanne Mae Schultetus, Doug-

**248**

las J. Schultetus, a minor, American Flyers, Inc., and The Ohio Casualty Insurance Company, there shall be awarded to the firm of Harris, Anderson, Henley & Rhodes, as attorneys, a reasonable fee of twenty percent of the amounts recovered.

12. That out of the recovery hereinabove allowed to Delores Senn, John Edward Senn and Kathy Anita Senn, minors, Mrs. Madie Jane Senn, and Aero Enterprises, Inc., there shall be awarded to the firm of McDonald, Sanders, Nichols, Wynn & Ginsburg, as attorneys, a reasonable fee of twenty percent of the amounts recovered.

Judgment in accordance herewith will be entered.