Robert C. PRICE, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Augusta Ida VERRETT, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

June Mills BUTLER, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Barbara Ann SHORTS, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant. (Two cases.)

Rose Marie MYLES, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Joyce May ALLEN, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Maurice Wilson REMY, Sr., et
al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. S78–0330(N), S78–0355(N), S–78–0354(N), S–79–0090(N), S79–0091(N), S79–0135(N), S78–0366(N) and S80–0480(N).

United States District Court,
S. D. Mississippi, S. D.

Dec. 11, 1981.

As Amended Dec. 18, 1981.

John L. Hunter, Cumbest & Cumbest, Pascagoula, Miss., for plaintiffs.

L. A. Smith, III, Asst. U. S. Atty., Jackson, Miss., James A. Lewis, Trial Atty., Torts Branch, Civ. Div., Dept. of Justice, Washington, D. C., for the U. S.

George E. Morse, Gulfport, Miss., Walter J. Phillips, Gex, Gex & Phillips, Bay St. Louis, Miss., for third party defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This cause was heard by the Court without a jury and taken under submission on the 23rd day of October 1981. After hearing the evidence on September 21–23, 1981, examining the exhibits, pleadings and stipulations, and proposed findings of fact and conclusions of law of counsel for all parties, this Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### The Depression

1. In 1965, Hurricane Betsy (Betsy) struck the Mississippi Coastline doing substantial damage to the entire area. Pursuant to the State of Mississippi's request, the United States' Office of Emergency Planning (OEP) (now the Federal Emergency Management Agency) initiated a disaster relief program. In Hancock County, Mississippi, the seawall was substantially destroyed by the Hurricane and the County was unable to perform necessary repairs.

2. The Hancock County Board of Supervisors (the Board) requested assistance from OEP to repair the damage done by Betsy. This request was formalized by the Board through a resolution passed on October 15, 1965, which states:

WHEREAS, on the 25th day of September, 1965, the President declared a "major disaster" in the State of Miss. under the provisions of Public Law 875, 81st Congress, as amended; and

WHEREAS, Hancock Co. is a public entity within said State;

NOW THEREFORE, Be It Resolved, by Board of Supervisors of Hancock Co. that the Office of Emergency Planning be and hereby is requested to arrange to have the appropriate Federal Agency perform the following emergency work essential to the health, safety or welfare of the people and property of this public entity:

Emergency repair to existing Seawall, and Debris clearance in connection with necessary repair of Sea Wall. Remove all debris which [constitutes] a health and

safety hazard from Highway 90 in Bay St. Louis to the end of the seawall south of Waveland. This body certifies that, to the best of its knowledge and belief, the requested work is eligible under Public Law 875, 81st Congress, as amended, and agrees to (a) provide without cost to the United States all lands, easements, and right-of-way necessary for accomplishment of the approved work; and (b) *hold and save the United States free from damages due to the approved work.*

Passed and approved this 15th day of October, 1965. (Emphasis supplied)

3. OEP arranged for the United States Army Corps of Engineers (Corps) to oversee and control the repairs to the seawall and the debris clean-up. The Corps contracted with Farrell Construction Company (Farrell) on July 1, 1966, to do the necessary repairs along the seawall and clean-up in Hancock County. (Contract No. DACW 01–67–C–0001) Farrell thereafter, subcontracted this work to Kingfisher Marine Services, Inc., who in turn subcontracted the required dredging operations to Jahncke Dredging (now known as OKC).

4. To repair the berm area a large amount of sand was needed to fill in around the repaired seawall. The contract called for a specific quality of sand to be used and that this sand could be obtained by dredging in the Mississippi Sound adjacent to the beach, but that the dredging was to be done no closer than fifteen hundred (1500) feet from the traverse line (seawall). The contract, however, contained no restrictions as to the depth the dredging operations could go in order to obtain the desired sand.

5. The contract further provided that the Corps through its Construction Division, would retain ultimate control over the project. The Corps' functions during the project involved approving contractor's shop drawings, construction practices, methods, materials, samples and schedules of work. (SMBR Ex. 5) In order for the project to be concluded, the contract required the Corps to inspect the work done and issue an acceptance.

6. Soil boring samples were randomly taken by the Corps all along the Hancock County coastline. These samples were provided to the dredging subcontractor to aid in the location of the desired quality sand. The samples indicated that suitable sand could be obtained from an area out in the water and south of the Gulfside Methodist Assembly (the Assembly). [P&V Ex. 21, 23]. Richard W. Champion, an engineer, interpreted the boring samples taken south of the Assembly and testified that the desired quality sand was located twenty-four to twenty-five feet below the mud line.

7. The dredging operation commenced in August of 1966, and was substantially completed by November 25, 1966. [US Ex. 16] In July of 1967, the Corps inspected and accepted the repair project. Prior to commencement of the 1966 dredging project, evidence showed that no depression or hole existed in the waters south of the Assembly, however, upon completion of the dredging work in 1967 a large borrow area or depression was found to exist approximately fifteen hundred feet off the seawall directly south of the Assembly. [P&V Ex. 13, 14, 16a–c, 17, 18, 19, 88] This depression was determined to be approximately eight hundred feet long and four hundred feet wide (800' × 400'). [P&V Ex. 88] Clarence S. Benton, Chief Engineer for Jahncke Dredging operations, estimated that the dredging off the Assembly shore was between twenty and thirty feet below the mud line.

*Warning Signs*

8. The Corps of Engineers' contract required that all borrow areas along the Hancock County coast be marked with warning signs. The contract specifically required:

The Contractor shall mark the inner limits of the borrow area by means of piles with warning signs. The piles shall be pressure treated as specified hereinafter for timber piles, shall be 6 to 8 inches in minimum butt diameter, and shall be not less than 22 feet long. The piles shall be installed approximately 500 feet apart, in reasonable alignment, and

with a penetration of approximately 8 feet. The piles shall be installed in water approximately 4 foot 6 inches and shall extend approximately 9 foot, 6 inches above the water. Each pile shall be provided with a warning sign. The warning signs shall face toward the shore. The sign shall be wood or metal, with two coats of white paint on each side and on the face side have the following sign in black letters not less than 3 inches high: "DEEP WATER TO SOUTH".

The requirement of the warning signs pursuant to the contract was an acknowledge of the Corps duty to warn the public of the hazardous condition created by the dredging.

9. At one point Farrell suggested that temporary signs be used, but the Corps instructed Farrell that only permanent signs would be acceptable. Upon Farrell's installation of the required signs, the Corps learned that some had been misplaced and required Farrell to properly relocate the signs. At all times during the work under Contract No. DACW 01–67–C–0001 the Corps took an active supervisory role and had knowledge that depressions were being created only a few hundred feet off the Hancock County shore.

10. Luther Fleming, an expert Safety Engineer, who had been employed by the Corps in the area of Safety Supervision for ten years, studied the warning sign requirements and viewed the coastline across from the Assembly. In his expert opinion, he concluded that: (1) the number of signs was wholly inadequate (one every five hundred feet); (2) the signs being placed only on the shore side of the depression were inadequate to warn a person who waded around to the backside of the depression; (3) the size of the lettering, the wording, and location of the signs on the pole were inadequate to reasonably warn the general public of the danger presented by the depression.

11. In its final Operations Progress Report, the Corps informed OEP that the repairs to the Hancock County seawall had been completed on March 5, 1967. Thereafter, in a letter dated March 16, 1967, the Corps stated its intention to transfer the future operations and maintenance of the repair project to Hancock County. In addition, the Court finds by this letter that the Corps intended to transfer the responsibility of supervising the dangerous condition created by their dredging, but that the Corps by their subsequent actions which prevented Hancock County from filling in or adequately marking the depression, this responsibility cannot be found to have been actually transferred.

### The Drownings

12. After the creation of the depression in 1967, numerous drownings began to occur in the area adjacent to the Gulfside Methodist Assembly and Jackson Ridge, now known as Buccaneer State Park. This case involves only the eight specific drownings discussed herein. This area has been used as a public beach for many years, and on a typical summer holiday could have several thousand people using the beach. Topographical data and photographs of the area show that the water adjacent to the Assembly and Park is very shallow for a great distance out from shore and very suitable for recreational purposes.

13. Russell Elliot, a member of the Hancock County Rescue Squad, recalled five people drowned in the depression off the Assembly beach in a ten day period during the summer of 1968. Between the years of 1968 and 1973, evidence showed that additional drownings occurred in this depression. Don McIntyre, Director of Civil Defense for Hancock County between 1973 and 1974, testified that on August 11, 1973, three people drowned in the depression, who were part of a group staying at the Assembly. The Court finds that beginning in 1968, an unusually large amount of drownings began to occur in the depression adjacent to the Assembly. [P&V Ex. 51, 60, 62, 91, 93 (newspaper accounts admitted for the limited purpose of giving notice of drownings) ].

14. Elliot, who served as President of the Hancock County Board of Supervisors from 1968 until 1972, made numerous re-

ports to the Corps about the drowning problem created by their 1965 dredging. Elliot specifically recalled meeting with the Corps on March 5, 1969, and in December 1969, wherein the hazardous condition created by the depression was the principal topic. The Board asked the Corps for approval to build a riprap, concrete pier (broken up concrete and soil) out to the depression in order to fill it in, but was denied permission as creating a menace to navigation. As an alternative the Board requested approval to place pilings completely around the depression, but the Corps also denied permission to do this for the same navigational reason. The Corps repeatedly told the Board that the Corps had exclusive jurisdiction over the depression since it was out in the Mississippi Sound and that no piling, riprap or other materials could be placed around or in the depression without the Corps expressed permission.

In 1970, after pleas by the Board, the Corps attempted to fill the depression with the materials dredged from the Bayou Cadet channel. These materials, however, were of a murky, silty, nonsubstantive nature and had little effect upon the depth of the depression. This fill did nothing more than give the appearance of a firm bottom that did not exist, because as a swimmer attempted to stand on the apparent bottom he would simply sink through the fill material to the depression's previous bottom. The Corps of Engineers again in 1978, attempted to fill the depression with materials dredged from Bayou Cadet, however, the same results were reached as in 1970 and the hazardous depression remained.

15. On June 13, 1976, Francisco Verrett, along with Harold Barquet and Greg Berry, entered the water in front of Buccaneer State Park and waded out in the water in a southeasterly direction without the water ever being over their heads. Berry remembered seeing a couple of wooden posts sticking a few feet out of the water, but neither Barquet or Berry remembered seeing any signs on the post. The three friends waded out in shallow water and due to the normal currents, they were pushed several hundred feet to the east; this point being due south

of the Assembly and on the seaward side of the depression. [P&V Ex. 88] As they attempted to return to shore, they waded into the depression where Verrett perished. Both Barquet and Berry were able to swim several hundred feet where shallow water was once again found. In an attempt to rescue Verrett, Barquet made several dives to the depressions apparent bottom. Barquet noted that the bottom in the depression was very soft, because when he attempted to push off the bottom his legs sank into a mucky material and only by using his arms was he able to reach the surface. Both Barquet and Berry testified that Verrett was in excellent physical condition and a good swimmer.

16. After the Verrett drowning, the Corps received notice of the hazard, once again, through various letters it received from Senator Stennis, Congressman Lott and Anita Lamb, Director of the Hancock County Chamber of Commerce, and from articles published in several Gulf Coast newspapers. [P&V Ex. 26, 63, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74 (Ex. 26 and 63 were admitted for the limited purpose of notice)] The Corps of Engineers did nothing to correct the hazardous condition, although they did acknowledge that the depression was dangerous by their proposed Maintenance Dredging Notice (Public Notice No. 75–901A, dated 12/2/76). [SMBR Ex. 5] The public notice acknowledged that the depression was created by a previous beach nourishment project and that it was a hazardous condition to anyone wading in the area.

17. On June 4, 1977, a church group from New Orleans was picnicking at Buccaneer State Park. Eight members of the group entered the water and waded out in a southeasterly direction to a point south of the depression and across from the Assembly. As the tide was out, the water had remained about waist deep as the group waded out, however, as they began to return to shore they suddenly found themselves in the deep water of the depression. [P&V Ex. 88] Within a matter of minutes, Chavela C. Price, Peter Wells, Jr., Demetrius Myles, Randall T. Shorts, Freddie Brown

and Marcy R. Butler drowned. Of the eight, only Charles and Elaine DiBartolo survived this tragedy. The DiBartolos testified that due to the shallowness of the water around the depression and the absence of any warning signs, the whole group was completely taken by surprise by the sudden deep water.

Elliot, who participated in the June 5, 1977, rescue operations, testified that no signs could be seen around the depression. He further testified that soundings indicated that the depression ranged from a minimum of ten to fourteen feet deep.

18. On June 3, 1979, Dale Joseph Remy and his sister, Dora Lynn Remy (now known as Dora Remy Couture) went to the beach across from the Assembly. While his sister remained on the beach, Remy who was six feet six inches tall went wading into the water. Couture noticed her brother was wading to the west of a pole in the water. The next time she looked for him he was gone and about three hours later his body was recovered from the depression and to the east of the pole near which he had last been seen. According to the testimony of Couture, the photographs taken by her a couple of days after her brother's death and the TV video tape taken on June 5, 1979, no warning signs were in the vicinity of the depression when Remy drowned. [SMBR Ex. 1, 22]

Several weeks later when Couture returned to the beach where her brother drowned, she found warning signs on the beach and in the water. [SMBR Ex. 18]

Lee Farrell, a fireman and member of the Hancock County Civil Defense in 1979, testified that in July of 1979, he took soundings in the depression area. He was unable to discover the actual depth of the depression due to the silty material covering the bottom; he indicated the silty material began about ten feet below the surface.

19. In the Spring of 1977, Bobby Boudin became the Civil Defense Director for Hancock County, and immediately he began a campaign to eliminate the dangerous condition created by the depression. He first contacted the Corps and requested that they fill in the depression or at least surround the area with signs and pilings. Boudin was continuously given one excuse after another by the Corps as to why they could not follow his requested plan, therefore, with the summer swimming season approaching Boudin put up three new signs himself. As the drownings continued and his suggestions were further overruled by the Corps, Boudin became more and more frustrated until in the summer of 1979, after the Remy drowning, he erected poles and warning signs that surrounded the depression. This was done without the Corps' help or permission. Only after the piling and signs were in place did the Corps finally grant Boudin's request to surround the depression; the permit was issued September 24, 1979.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and all parties to these Consolidated Causes pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1976), and the Mississippi Wrongful Death law controls all of these Consolidated Causes. Further, all administrative remedies have been exhausted as required by law. *Wright v. United States*, 568 F.2d 153 (10th Cir. 1977).

2. The Court has made detailed findings concerning the drownings that occurred off the Hancock County, Mississippi, coastline across from Gulfside Methodist Assembly and Buccaneer State Park. To the extent that these findings also constitute legal conclusions, they are incorporated herein.

3. The United States, by and through the Corps of Engineers, is liable for the wrongful deaths of Francisco Verrett, Chavela C. Price, Peter Wells, Jr., Demetrius Myles, Randall T. Shorts, Freddie Brown, Marcy R. Butler and Dale Joseph Remy under the Federal Tort Claims Act and the Mississippi Wrongful Death Statute, Miss. Code Ann. § 11–7–13 (1972). The United States was guilty of negligence in its supervision of the 1966 dredging operations and warning system established off the Hancock County coastline in front of Gulfside

Methodist Assembly. The Corps contracted for the repair of the Hancock County seawall knowing that such repairs required that large quantities of sand would be needed. The Corps allowed the dredging contractor to obtain a large amount of sand from uncontrolled depths on a sandbar only fifteen hundred feet from the seawall on the public beach across from the Assembly and Buccaneer State Park. This dredging created a hazardous condition in the form of a depression surrounded by shallow water. The Corps was further negligent in the design of a warning system around the depression and in the supervision of that warning system. This negligence was the proximate cause of the drownings involved in these Consolidated Causes.

 4. By letter of March 16, 1967, the Corps attempted to transfer the future operations and maintenance of the entire repair project to Hancock County. (*See* Finding of Fact No. 11) The rule applicable to this case is that a party (the Corps) is liable for an injury caused by its failure to perform an imposed duty, unless that party has lawfully delegated the duty and given up all control and supervision arising out of that duty. *Hooey v. Airport Construction Co.*, 253 N.Y. 486, 171 N.E. 752, 754 (1930).[1] *See Peter v. Public Constructors, Inc.*, 368 F.2d 111, 113–14 (3d Cir. 1966); *Otis Elevator Co. v. Yager*, 268 F.2d 137, 143 (8th Cir. 1959); *Getz v. Del E. Webb Corp.*, 38 Ill. App.3d 880, 349 N.E.2d 682 (1976); *Walters v. Kellam & Foley*, 172 Ind.App. 207, 360 N.E.2d 199 (1977); *Cavanaugh v. C. P. Boland Co.*, 149 Misc. 576, 268 N.Y.S. 390 (1933); *Smith v. Wilson*, 325 P.2d 421 (Okl. 1958). Here the Court finds that the Corps' actions which prevented Hancock County from taking adequate measures to insure public safety, *i.e.*, filling in or placing sufficient warning signs around the depression, cannot be equated with giving up all control and supervision of the depression.

Thus these actions mandate the conclusion that the responsibility of supervising the dangerous condition created by the depression remained with the Corps despite the letter of March 16, 1967.

The Court's finding that the Corps had control and supervision of the depression area is further supported by the Corps' own declaration that it has exclusive jurisdiction over the control of markings in the Mississippi Sound for navigation reasons. This regulatory jurisdiction is given to the Corps by 33 C.F.R. § 329.12 (1980), and is defined to include all navigable waters "within a zone three geographic (Nautical) miles seaward from the coast line.... Regulatory jurisdiction in coastal areas extends to the line on the shore reached by the plane of the mean (average) high water."

 While the Court is cognizant of the general rule that once construction work, such as this, has been completed, *turned over to and accepted by*, the contracting party, the contractor is relieved of further responsibility. There are, however, many recognized exceptions to this rule. One of these exceptions is that a contractor will be held liable even after transfer of a project to the contracting party when the work performed is found to be a public nuisance. *See Schumacher v. Carl G. Neumann Dredging & Improvement Co.*, 206 Wis. 220, 239 N.W. 459, 460 (1931). In *Schumacher*, a contractor was found to have dredged a deep hole in the shallow water of a lake used for public swimming. After completion of the project several drownings occurred in the dredged area of the lake. The Wisconsin Supreme Court held that the contractor remained liable for its negligent dredging *even after the principals accepted the work* because the work was considered to be a public nuisance and the responsibility was therefore not transferable. *Id.* 239 N.W. at 460. While the

---

1. In the *Hooey* case, Judge Cardozo made the following statement:

"In brief, the burden is on the contractor, when once the negligent condition has been proved, to accept responsibility for the conduct of an enterprise admittedly its own, or, if responsibility is to be escaped, to show how and why it was shifted to some one else. Escape from responsibility through the delegation of duty to another is a defense to be proved, not a privilege presumed."

public nuisance doctrine of *Schumacher* could possibly be applied to this case, neither party has raised this theory. The Court finds ample support for its conclusion that the Corps is liable due to the fact that it retained control and supervision of the depression area, thereby negating any attempt on March 16, 1967, to transfer responsibility for the depression area to Hancock County and also negating the effect of the hold harmless clause in the resolution of October 15, 1965. (Findings of Fact No. 2)

■ 5. The meaning of the language in the October 15, 1965, resolution (*See*·Findings of Fact No. 2) which states that the Hancock County Board of Supervisors will "hold and save the United States free from damages due to the approved work," is a question this Court must determine. The Supreme Court in *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), when interpreting an indemnity agreement specifically stated that:

> We agree with the Court of Appeals that a contractual provision should not be construed to permit an indemnitee to recover for its own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. This principle though variously articulated, is accepted with virtual unanimity among American jurisdictions. The traditional reluctance of courts to cast the burden of negligent actions upon those who were not actually at fault is particularly applicable to a situation in which there is a vast disparity in bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors. *See United States v. Haskin*, 395 F.2d 503, 508 (C.A. 10th Cir. 1968).

*Id.* at 211–12, 90 S.Ct. at 885. In this case Hancock County was clearly in an unequal bargaining position when the resolution was adopted, as it was in a state of emergency due to the devastation of its coastline by Hurricane Betsy. The Court finds that the "approved work" intended by all the parties was the restoration of the seawall and not the independent dredging operations in the Mississippi Sounds. "An undertaking to indemnify against the indemnitee's own negligence will not be inferred from doubtful language but must be clearly and unequivocally expressed." *Jemison v. The Duplex*, 163 F.Supp. 947, 951 (S.D.Ala.1958) (quoting, *Turner Construction Co. v. W. J. Halloran Steel Erection Co.*, 240 F.2d 441, 444 (1st Cir. 1957)). Here such clear and unequivocal language does not exist. By the hold harmless language, it could not be inferred that Hancock County agreed to assume responsibility for the Corps of Engineers negligent performance and supervision of the contracted work.

■ 6. The Corps of Engineers prepared, controlled, supervised, contracted and carried out the restoration of the Hancock County seawall in 1966. While the preparation of the contract may have been a "discretionary function" which pursuant to 28 U.S.C. § 2680(a) (1976), the United States is given an immunity under the Federal Tort Claims Act, however, the controlling, supervising, contracting and carrying out of the contract to repair the seawall cannot be considered a discretionary function. The warning sign system around the depression was also a product of the Corps, since they designed, planned and contracted for its installation. Courts have consistently held that the Government's decisions concerning the design, plans and specifications are not within the discretionary function exception of 28 U.S.C. § 2680(a) (1976). *See Seaboard Coastline Railway Co. v. United States*, 473 F.2d 714, 716 (5th Cir. 1973) (negligent design of a drainage system); *Jemison v. The Duplex*, 163 F.Supp. 947, 951 (S.D.Ala.1958) (negligent drawing of plans and specifications for dredging the Mobile Harbor).

Once the Corps agreed to repair the seawall and decided to dredge in the Mississippi Sound, they were no longer exercising a discretionary policy-making function and they were required to perform the operational functions in a non-negligent manner. *See Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); *Indian Towing Co. v. United States*, 350

U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *United States v. Hunsucker*, 314 F.2d 98 (9th Cir. 1962); *Costley v. United States*, 181 F.2d 723 (5th Cir. 1950); K. Davis, Administrative Law Supplement § 25.08 (1971). The Corps was not given a *carte blanche* to design, contract and carry out the restoration of the seawall in negligent disregard for the rights of the public. This Court finds that the acts of negligence by the Corps of Engineers were committed at the "operational level" and for these acts they do not enjoy an immunity under 28 U.S.C. § 2680(a) (1976). Operational negligence is actionable negligence.

7. The Court finds that at the time of the 1966 dredging, the Corps was aware, or should have been aware, that the beach and shallow waters within fifteen hundred feet of the seawall across from Gulfside Methodist Assembly was used by the general public for sunbathing, swimming, fishing and boating, and as a matter of law, the Corps was charged with such knowledge. Further, decedents in these Consolidated Causes were all members of the general public and the Corps owed each such person a legal duty to use ordinary care to leave the beach and swimming area in a reasonably safe condition after completion of the 1966 contract. This the Corps did not do, as they left the beach and swimming area across from the Assembly in an unreasonably and latently dangerous condition. The Corps also failed to provide adequate notice and warning of the latent peril constituted by the depression they had created by the 1966 dredging. Finally in September of 1979, only after all of the drownings of these Consolidated Causes, did the Corps of Engineers grant the Hancock County Board of Supervisors permission to put up an adequate warning system surrounding the depression.

8. Based upon the foregoing, the Court finds that the Defendant, the United States of America, acting by and through its agent and instrumentality, the Corps of Engineers, is liable to the Plaintiffs represented in these Consolidated Causes.

9. The Court is cognizant of the fact that Mississippi law of comparative negligence is applicable. The Court finds, based upon the facts presented in this case, that no negligence was proven on the part of any of the eight drowning victims which could be said to have contributed to their deaths.

10. By agreement and stipulation of all the parties, only the issue of liability was tried before the Court, consequently the Court does not reach the damage issue.

It is therefore ORDERED, ADJUDGED and DECREED that the United States is found liable for the drownings of Francisco Verrett, Chavela C. Price, Peter Wells, Jr., Demetrius Myles, Randall T. Shorts, Freddie Brown, Marcy R. Butler and Dale Joseph Remy.

A Judgment will be forthwith entered in accordance with the above Findings of Fact and Conclusions of Law.