726 F.2d 1057
 June Mills BUTLER, et al., Plaintiffs,
v.
UNITED STATES of America, Defendant-Third Party Appellant,
v.
HANCOCK COUNTY, MS, Third Party Defendant-Appellee.
Robert C. PRICE, et al., Plaintiffs-Appellants Cross-Appellees,
v.
UNITED STATES of America, Defendant-Third Party
Plaintiff-Appellee Cross- Appellant,
v.
HANCOCK COUNTY, MS, Third Party Defendant-Cross-Appellee.
Augusta Ida VERRETT, et al., Plaintiffs-Appellants Cross-Appellees,
v.
UNITED STATES of America, Defendant-Third Party
Plaintiff-Appellee Cross- Appellant,
v.
HANCOCK COUNTY, MS, Third Party Defendant Cross-Appellee.
 Nos. 82-4402, 82-4475.
 United States Court of Appeals,
Fifth Circuit.
 March 12, 1984.
 
 James A. Lewis, Asst. U.S. Atty., Springfield, Ill., for U.S.
 White & Morse, George E. Morse, Gulfport, Miss., Gex, Gex & Phillips, Walter J. Gex, III, Bay St. Louis, Miss., for Hancock County, MS.
 John L. Hunter, David O. McCormick, Pascagoula, Miss., for plaintiffs-appellants cross-appellees.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before CLARK, Chief Judge, GARZA and JOLLY, Circuit Judges.
 GARZA, Circuit Judge:
 
 
 1
 We have before us appeals and cross-appeals from the district court's judgment following a trial to the court of consolidated actions for wrongful death against the United States. Plaintiffs represent individuals who drowned in a depression located some 1,500 feet from a seawall, the depression formed by dredging operations of the Army Corps of Engineers while repairing the hurricane-damaged seawall.
 
 Factual Background
 
 2
 The district court's Findings of Fact, from which our recitation of the facts derives, reflect the following:
 
 
 3
 Hurricane Betsy slammed into the Louisiana-Mississippi coastline in September of 1965, its 125 mph winds and 15 foot tidal surge killing 75 people and causing substantial property damage. Hancock County, Mississippi, bordered by Louisiana on the west and the Mississippi Sound (an arm of the Gulf of Mexico) on the south, suffered considerable damage, including the near total destruction of its seawall. The County, unable to perform the necessary repairs to the seawall, sought aid from the federal government's disaster relief program. The Hancock County Board of Supervisors formalized the request for assistance by passing a resolution regarding the same on October 15, 1965.[1] The resolution stated, among other things, that the County would "hold and save the United States free from damages due to the approved work."
 
 
 4
 The Army Corps of Engineers (Corps) was to oversee and control the repair of the seawall and the clean-up of debris. It contracted with Farrell Construction Company (Farrell) in July of 1966 to perform the actual seawall repair and debris clean-up. Farrell subcontracted the work to Kingfisher Marine Services, Inc., which subcontracted the required dredging operations to Jahncke Dredging. The contract, however, provided that the Corps' Construction Division would retain ultimate control over the project and would approve the contractor's shop drawings, construction practices, methods, materials, samples, and work schedules. The contract also provided that conclusion of the project was subject to inspection and acceptance by the Corps.
 
 
 5
 After the seawall itself was repaired, a large amount of sand was needed to fill in around the seawall and repair its berm. The contract specified a particular quality of sand to be used and stated that the sand could be obtained by dredging in the Mississippi Sound. Soil boring samples, randomly taken along Hancock County's coastline, indicated that suitable sand was obtainable from an area in the water south of the Gulfside Methodist Assembly.
 
 
 6
 The dredging operation commenced in August of 1966 and was substantially completed by November of that year. The Corps inspected and accepted the repair project in July, 1967. The dredging, however, had left a large depression, or "borrow area," approximately 800 feet long and 400 feet wide located some 1500 feet off the seawall directly south of the Assembly. The Corps' repair contract contained specific requirements for the placement of signs warning of such borrow areas.[2] The district court found that this requirement in the contract "was an acknowledge[ment] of the Corps duty to warn the public of the hazardous condition created by the dredging." Price v. United States, 530 F.Supp. 1010, 1013 (S.D.Miss.1981).
 
 
 7
 The Corps continued to act in a supervisory capacity while Farrell worked on the problem of marking the depression. At one point Farrell suggested that temporary signs be utilized, but the Corps instructed that only permanent signs would be acceptable. Furthermore, after Farrell had installed the signs, the Corps learned that some had been misplaced and required Farrell to relocate the signs.
 
 
 8
 At trial, expert witness Luther Fleming, a Safety Engineer employed by the Corps for ten years, testified that in his opinion the number of warning signs (one every 500 feet) was wholly inadequate. He further stated that the signs, placed only on the shore side of the depression, were inadequate to warn a person who had waded around to the seaward side of the depression and that the signs' wording, lettering size, and location of the signs on the poles was inadequate to reasonably warn the general public of the danger presented by the depression.
 
 
 9
 By letter dated March 16, 1967, the Corps asserted its intention to transfer the future operations and maintenance of the repair project to the County.
 
 
 10
 The beach adjacent to the Assembly and Jackson Ridge, now known as Buccaneer State Park, has been a popular public recreation area for many years; several thousand people visit the area on peak days. One reason for its popularity is that the water in that area is very shallow for a great distance out from shore, thus making it relatively safe for young swimmers and waders. After the creation of the depression in 1967, however, an unusually large number of drownings began to take place. Five people drowned in the depression in a ten day period in the summer of 1968, and three people staying at the Assembly drowned in the depression on August 11, 1973. Many other drownings occurred in the depression during the intervening years.
 
 
 11
 Russell Elliot, President of the Hancock County Board of Supervisors from 1968 through 1972 and a member of the Hancock County Rescue Squad, repeatedly reported these drownings to the Corps. The hazardous condition created by the depression was the topic of two meetings with the Corps in 1969, and the Board sought permission from the Corps to build a concrete riprap out to the depression in order to fill it in. The Corps refused permission, stating the riprap would create a navigation hazard. The Board then asked to surround the depression with pilings; this solution was rejected for like reasons. As found by the district court, "[t]he Corps repeatedly told the Board that the Corps had exclusive jurisdiction over the depression since it was out in the Mississippi Sound and that no piling, riprap or other materials could be placed around or in the depression without the Corps' expressed permission." Price v. United States, supra, at 1014.
 
 
 12
 In 1970, after pleas by the Board, the Corps tried filling the depression with material dredged from the Bayou Cadet channel. The fill material was of a silty nature, however, and only gave the appearance of a firm bottom. A swimmer attempting to stand on the material would simply sink through to the actual bottom of the depression.
 
 
 13
 On June 13, 1976, Francisco Verrett, with friends Harold Barquet and Greg Berry, waded out into the shallow water in front of Buccaneer State Park. The current moved them eastward to a point on the seaward side of the depression. Attempting to return to the beach, they waded into the depression. Verrett drowned. Barquet and Berry managed to swim several hundred feet to where shallow water was again found. Barquet then returned to the depression and made numerous dives to the apparent bottom to try to rescue Verrett, to no avail. Barquet noticed that the bottom was soft, such that his legs sank into the silt when he attempted to push off the bottom. Berry later recalled seeing a couple of wooden posts projecting a few feet out of the water; neither recalled seeing any warning signs on the posts.
 
 
 14
 The Corps received notice of the Verrett drowning and was again contacted by various persons concerning the depression, including Senator Stennis, Congressman Lott and Anita Lamb, Director of the Hancock County Chamber of Commerce. Again, the Corps failed to take any action to relieve the hazardous condition.
 
 
 15
 When Bobby Boudin became Civil Defense Director for the County in the Spring of 1977, he immediately began working to eliminate the dangerous condition created by the depression. His requests to the Corps to have the depression filled or surrounded by signs and pilings were excused for various reasons. Boudin, aware of the upcoming summer swimming season, ended up erecting three new signs himself.
 
 
 16
 Tragedy struck again on June 4, 1977. Eight members of a New Orleans church group visiting Buccaneer State Park waded out in the shallow water to the seaward side of the depression. It was low tide and the water was only waist deep. When they began to return to shore, however, they suddenly found themselves surrounded by the deep waters of the depression. In only minutes, Freddie Brown, Marcy R. Butler, Demetrius Myles, Chavela C. Price, Randall T. Shorts, and Peter Wells, Jr. drowned. The two survivors, Charles and Elaine DiBartolo, testified that the group was taken completely by surprise since the surrounding water was shallow and no warning signs were seen. Russell Elliot, who participated in the recovery operations, testified that no warning signs could be seen around the depression.
 
 
 17
 Bobby Boudin renewed his efforts to have something done about the depression. The Corps, however, continued to overrule his suggestions.
 
 
 18
 On June 3, 1979, Dale Joseph Remy and his sister, Dora Lynn Remy, went to the beach adjacent to the Assembly. While Dora waited on the beach, Dale (who was 6 feet, 6 inches tall) went wading. Dora saw him wade to the west of a pole projecting from the water. The next time she looked, he was not in sight. Three hours later his body was recovered from the depression. No warning signs were seen.
 
 
 19
 Following this incident, and without the Corps' help or permission, Boudin surrounded the depression with pilings and warning signs. On September 24, 1979, after these signs were already in place, the Corps finally issued a permit allowing them.
 
 Proceedings Below
 
 20
 Representatives of the eight decedents brought suit against the United States, the contractor and the dredging contractors, alleging causes of actions under the Federal Tort Claims Act and Mississippi's Wrongful Death Statute for the failure to provide and maintain adequate warning signs. The United States filed a third party claim against Hancock County for indemnity on the grounds the County agreed to hold the United States free from damages relating to the disaster relief, and for contribution on the grounds the County was primarily responsible for maintaining warning signs in the area.
 
 
 21
 The contractor and dredging subcontractors settled with plaintiffs prior to trial. The district court then tried the liability issues first, finding the United States liable for negligence in its supervision of the dredging operations and its design and maintenance of the warning system. The court held that the United States was not entitled to contribution or indemnity from the County. See Price v. United States, 530 F.Supp. 1010 (S.D.Miss.1981).
 
 
 22
 In August, 1982, the United States settled the damages in six of the cases for $75,000 each, then appealed from the judgment denying its third party claim for indemnity or contribution from the County. The district court tried the issue of damages in the remaining two cases; plaintiffs appeal the damage awards and the United States appeals on the issues of liability and third-party liability, and cross-appeals the damage awards.
 
 I.
 Discretionary Function Exception
 
 23
 The Federal Tort Claims Act (FICA), 28 U.S.C. Sec. 1346(b), authorizes suits against the United States for money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (Emphasis added). Governmental immunity from suit is maintained by 28 U.S.C. Sec. 2680(a) for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." (Emphasis added). The district court held that while preparation of the contract to restore the Hancock County seawall may have been a discretionary function within the meaning of the exception, "the controlling, supervising, contracting and carrying out of the contract" was not discretionary. Price v. United States, supra, at 1017. The court stated that these actions were "operational" in nature and thus did not enjoy immunity. Id. at 1018.
 
 
 24
 The Government argues that its decisions regarding the design, plans and specifications of the warning system, as well as the carrying out of those decisions, fall within the discretionary function exception. The Government relies primarily on Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In Dalehite, the plaintiffs sued the Government for damages resulting from the explosion of nitrate fertilizers manufactured by the Government for shipment to Europe. Plaintiffs claimed the United States was liable for allowing the manufacture and shipment of the inherently dangerous fertilizers without either warning of the hazard or requiring safe procedures for handling the fertilizers. The Supreme Court denied recovery, holding the Government's acts to be discretionary:
 
 
 25
 It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of Sec. 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.
 
 
 26
 346 U.S. at 35-36, 73 S.Ct. at 968.
 
 
 27
 As we recently noted in our en banc opinion in Payton v. United States, 679 F.2d 475, 479 (5th Cir.1982), the Supreme Court has narrowed the application of the guidelines set out in Dalehite. In Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court held the Government liable for damages caused when the plaintiff's barge ran aground due to the Coast Guard's negligent operation of a lighthouse. While finding the decision to operate the lighthouse a matter of discretion and thus protected, the Court held there was no discretion to operate the light negligently. In Rayonier Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), the Court allowed an action against the United States for the negligence of its Forest Service employees in fighting a forest fire, determining that the decision not to send a crew to extinguish a smouldering fire was operational and not discretionary.
 
 
 28
 Decisions in this Circuit prior to Payton further exemplify the rejection of the strict interpretation of the discretionary function exception. In Pigott v. United States, 451 F.2d 574 (5th Cir.1971), an action brought for damages to the plaintiff's house caused by the test firing of the Saturn rocket, we stated that although the "activity complained of ... might fall within the sweep of the broad language in Dalehite ...," both Rayonier and Indian Towing supported our decision "that the kind of discretion exercised by the government in this case, involving decisions merely as to the day and hour of the firing and the amount of thrust to be developed by the Saturn engines, [was] insufficient to insulate the defendant from Mississippi tort law concepts through [the discretionary function exception]." 451 F.2d 574 at 575. Similarly, in Seaboard Coast Line Railroad Company v. United States, 473 F.2d 714 (5th Cir.1973), we refused to extend the exception to the negligent design of a drainage ditch built in connection with an aircraft maintenance facility:
 
 
 29
 The discretionary function envisioned by 28 U.S.C. Sec. 2680(a) and by Dalehite was the government's policy decision to construct an aircraft maintenance facility at Fort Rucker and to build a drainage system in furtherance of that goal. Once the government decided to build a drainage ditch, it was no longer exercising a discretionary policy-making function and it was required to perform the operational function of building the drainage ditch in a non-negligent manner.
 
 473 F.2d 714 at 716.[3]
 
 30
 Likewise, the Government exercised its discretion in deciding to repair the Hancock County seawall and to dredge in the Mississippi Sound for the sand needed to repair the seawall's berm area. We agree with the district court that once these decisions were made, the Government was no longer exercising a discretionary function and was required to perform the related operational functions with reasonable care. Nor can we accept the Government's argument that it is insulated from suit because the transfer of the project to the County was a discretionary function, as was the exercise of Section 10 regulatory authority over the area.[4] The Government attempts to use as a shield the very actions that caused the dangerous condition to remain. Having negligently failed to either fill in the depression or adequately warn swimmers of the danger, the Government attempted to turn over responsibility for the hazardous condition, while retaining control, or at least veto power, over the actions required to relieve or properly warn of the condition. We do not accept this argument.
 
 
 31
 We hold that the discretionary function exception to the FTCA does not act to bar these lawsuits.
 
 II.
 
 32
 The United States next argues that the district court erred in finding that the disaster relief was provided without reasonable care. The Government argues that the court failed to consider the fact that the Corps did not prohibit the County from placing additional posts in the shallow waters inshore of the dredged area; that additional posts were installed in this area; and that Section 10 required restriction of posts and signs in navigable water.
 
 
 33
 We disagree. While the evidence reflects that additional signs were erected by the County in the shallow water inshore of the depression, the evidence is also clear that these signs were inadequate to warn swimmers of the hazard involved. The drowning victims entered the depression from the south after having been drawn eastward by the current. In order to provide adequate warning of the deep water to swimmers, the depression would have to be surrounded by posts and signs. The Government would not permit this, asserting that it would constitute a navigation hazard. The Government was therefore negligent in authorizing the dredging in an area where the resulting depression would be hazardous to swimmers, yet located where the Government would not permit the warnings necessary to prevent accidents of this type.
 
 III.
 Indemnity Claim
 
 34
 As stated in our recitation of the facts, Hancock County agreed to "hold and save the United States free from damages due to the approved work." The district court held that since the intent to indemnify the Government for its own negligence was not clearly and unequivocally expressed in the indemnity clause, no such intent existed. The court further held that the "approved work" contemplated by the parties was "the restoration of the seawall and not the independent dredging operations in the Mississippi Sounds." 530 F.Supp. at 1017. The district court therefore denied the Government's claim for indemnity. We reach the same result as the trial court, although for different reasons.
 
 
 35
 The interpretation of the County's indemnity clause is controlled by federal law, it having been adopted as part of a contract "entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution." United States v. Seckinger, 397 U.S. 203, 209-10, 90 S.Ct. 880, 884-85, 25 L.Ed.2d 224 (1970). See also United States v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). In Seckinger, a contractor's employee, injured as a result of the government's negligence while he was working on a government project, recovered a judgment against the United States under the FTCA. The United States sought indemnity from the contractor pursuant to an indemnity clause providing that "[t]he Contractor ... shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work." 397 U.S. 203 at 208 n. 9, 90 S.Ct. 880, 883 n. 9 (emphasis added). The Supreme Court denied the indemnity claim, holding that an indemnity provision should not be construed to permit indemnification for one's own negligence unless the mutual intent of the parties to this effect is clearly expressed. The Court then provided an example of a contract provision clearly providing for indemnity regardless of the indemnitee's own negligence. The sample clause provided, in pertinent part, that "[t]he Contractor shall indemnify and hold harmless the Owner ... against all claims, damages, losses and expenses ... arising out of or resulting from the performance of the Work ... regardless of whether or not it is caused in part by a party indemnified hereunder." 397 U.S. 203, 212 n. 17, 90 S.Ct. 880, 886 n. 17. The Supreme Court then stated: "We specifically decline to hold that a clause that is intended to encompass indemnification for the indemnitee's negligence must include an 'indemnify and hold harmless' clause or that it must explicitly state that indemnification extends to injuries occasioned by the indemnitee's negligence." Id.
 
 
 36
 We had occasion to analyze this sample provision, and the Court's comments quoted above, in Smith v. United States, 497 F.2d 500 (5th Cir.1974). In Smith the United States was held liable for its negligence in injuring an employee of a subcontractor working on the construction of a levee by the Army Corps of Engineers. The United States sought indemnification pursuant to a contractual provision stating that "[t]he Contractor shall assume all liability and hold and save the Government ... harmless for any and all claims for personal injuries ... arising out of ... the contract." We noted that, like the sample provision in Seckinger, the Smith clause also contained "hold harmless" language; the Smith clause did not specifically provide for indemnity regardless of the Government's negligence, however. Holding the indemnity clause in Smith sufficient to indemnify the Government even though the Government was negligent, we discussed the Supreme Court's comments quoted earlier regarding the sample clause in Seckinger:
 
 
 37
 The use of the disjunctive in this quotation raises a clear inference that a clause which does in fact utilize "hold harmless" language indicates the intent of the parties for the indemnity to operate despite negligence by the indemnitee. This is to say, if neither "hold harmless" language or an express disclaimer is required, the negative inference arises that the presence of either is a strong indication that indemnity is intended in spite of or regardless of negligence on the part of the indemnitee.
 
 
 38
 Smith v. United States, 497 F.2d 500 at 508.
 
 
 39
 The indemnity provision agreed to by Hancock County provided that the County would "hold and save the United States free" from damages. We see no reason to distinguish this language and the "hold and save harmless" language approved in Smith, and therefore find that Hancock County agreed to indemnify the Government, regardless of the Government's own negligence.
 
 
 40
 We also find that the County, by promising to indemnify the Government for damages due to the "approved work," intended to indemnify the Government for all damages relating to the restoration of the seawall, including the dredging operations. We see no reason to limit the term "approved work" to only those damages arising from work on the seawall itself. The plain and logical meaning of the term in the context used encompasses all of the work approved and required to be performed to repair the seawall, as well as the completed seawall itself. The term is not expressly limited in the indemnity agreement, nor has any evidence been presented to show that the parties intended anything other than the term's ordinary meaning.
 
 
 41
 Having construed the indemnity clause in favor of the United States, we must nevertheless deny the claim for indemnity in this case. The trial court found that the Government retained control and supervision over the depression area, negating the attempt to transfer responsibility for the depression to the County and also negating the effect of the hold harmless clause. Stated differently, the Government transferred responsibility for the hazardous condition to the County, yet, by the exercise of its regulatory authority, prevented the County from taking those actions necessary to warn of the danger. While one may contract to indemnify one's own negligence, we hold as a matter of public policy that an indemnitee may not enforce such an indemnity contract where the indemnitor is prevented by the indemnitee from properly relieving or warning of a hazardous condition caused by the indemnitee's negligence. We are painfully aware that the Government's regulatory actions in this instance were taken with the public's interest in safe navigable waters in mind. The ultimate responsibility for the results, however, must rest with the Government in this case.
 
 
 42
 For similar reasons we reject the Government's argument that the trial court erred in holding it not entitled to contribution from the County. The Government's negligence in creating the depression in an area where it would not allow the placement of proper warnings cannot now be shifted to the County under the guise of "transfer of responsibility." Responsibility without control results in the inequity of liability without fault, which we refuse to find.
 
 IV.
 Damages
 
 43
 Having determined the issues relating to liability, we now turn to the damages issues, considering first the choice-of-law question.
 
 Choice of Law
 
 44
 The district court applied Mississippi law when determining the elements and measure of damages to be awarded. The Government contends this was error, arguing that the law of Louisiana, the residence of the decedents and their legal representatives, should have been applied. We find otherwise.
 
 
 45
 In Mitchell v. Craft, 211 So.2d 509 (Miss.1968), the Mississippi Supreme Court adopted the "center of gravity" or "most significant relationships" test set out in Sec. 145 of the Restatement (Second) of Conflict of Laws.[5] The court, quoting the Restatement, stated:
 
 
 46
 In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied. (emphasis added).
 
 
 47
 Id. at 515. In determining which state has the more significant relationship to the occurrence and the parties, the contacts to be considered include:
 
 
 48
 (a) the place where the injury occurred,
 
 
 49
 (b) the place where the conduct causing the injury occurred,
 
 
 50
 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
 
 
 51
 (d) the place where the relationship, if any, between the parties is centered.
 
 
 52
 Id. Viewing these contacts in light of the facts of this case, it is apparent that the only contact favoring the application of Louisiana law is the residence of the plaintiffs and their decedents. Although the plaintiff's residence is an important consideration, in this case it is outweighed by the remaining contacts, all which favor applying Mississippi law.[6] We reached this same result in Wright v. Standard Oil Company, Inc., 470 F.2d 1280 (5th Cir.1972), cert. denied, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973), holding Mississippi law applicable to an action for damages arising from injuries to an Indiana resident who brought suit in Mississippi after being struck by the defendant's truck in Mississippi.
 
 
 53
 We hold that the trial court correctly held Mississippi law applicable to these actions.Lifetime Earnings
 
 
 54
 Plaintiffs and the United States both attack the district court's determination of the present net cash value of the decedents' lifetime earnings, an element of damages for wrongful death under Mississippi law. Sheffield v. Sheffield, 405 So.2d 1314 (Miss.1981); Dickey v. Parham, 331 So.2d 917 (Miss.1976); Louisville & N.R. Company v. Garnett, 129 Miss. 795, 93 So. 241 (1922). This element includes the decedent's probable gross lifetime earnings, minus personal living expenses, discounted to present value. See Sheffield v. Sheffield, supra. Under Mississippi law, "the living expenses of the deceased [are] deducted from the present cash value of the deceased's life," so that the deceased is not, in effect, "more valuable to his family dead than alive." Sheffield v. Sheffield, supra, at 1317-1318. "From the deceased's probable gross annual income there must be deducted what he/she 'would have spent on personal living expenses.' " Id.
 
 
 55
 Evidence of the amount of this deduction was provided by plaintiff's expert witness, economist Dr. Paul Oliver, and defendant's expert witness, economist Dr. Kenneth Boudreaux. Dr. Oliver testified that he did not believe that such a deduction should be made, but that if it was made he preferred to deduct an amount of from 15%-23%. Supp.R. p. 87-88. He further testified, however, that these figures were from an unofficial report which he did not believe. Id. Dr. Boudreaux testified that, based on authoritative statistical sources, the average person consumes 94% of his or her income, saving the remaining 6%. Supp.R. at 168. He testified that this remaining 6%, with accumulated interest during life expectancy, represented the net lifetime earnings of a decedent.
 
 
 56
 In calculating this element in the case at bar the trial court first determined each decedent's gross probable lifetime earnings; this was done by multiplying his or her work life expectancy by the median annual income he or she probably would have earned, based on statistical data. The court then awarded 6% of this amount, resulting in an award of $44,471.92 in the case of decedent Price for this element of damages, and $63,123.26 in the case of decedent Verrett. Plaintiffs contend the district court reduced the amount of gross earnings by more than each decedent's personal living expenses, and further argue that the court failed to consider the effects of inflation in computing the award. The Government contends the trial court failed to reduce the award to its present value.
 
 
 57
 Plaintiffs argue that the trial court erred in applying this 6% figure to determine net lifetime earnings, stating that the figure does not take into account earnings that would have been spent on, for example, the deceased's family and friends. Plaintiffs, however, offered no evidence regarding these amounts. The only evidence in this regard came from Dr. Boudreaux, who testified otherwise:
 
 
 58
 "If the heirs, for instance, had been a spouse or children that could have been expected to be supported by the income of that individual, then the spouse and the children in economic justice could expect to receive an amount of money that could be invested in order to produce their lost support across the future, in addition to the residual estate. The implication being because that individual is not working, the income that would have been used to support them is not available. However, we have no spouses or surviving children, so consequently there are no individuals that could have expected pecuniary economic support from the income of those individuals, other than some residual estate."
 
 
 59
 Supp.R. at 156. We find that the district court's finding in this regard, based on the evidence presented, is not clearly erroneous.
 
 
 60
 We also find without merit plaintiff's claim that the district court failed to consider the effects of inflation, and the Government's argument that the court failed to award an amount representing the present value of net lifetime earnings. The court's Findings of Fact and Conclusions of Law indicate that the award was made after considering Sheffield v. Sheffield and Dickey v. Parham, supra, controlling Mississippi Supreme Court cases on damages in wrongful death actions. The trial judge heard all of the evidence and the record reflects that the trial judge actively participated in questioning the expert witnesses of both parties during the two days on which they testified. The expert witnesses' testimony as to the amount to be awarded for this element of damages varied greatly, and the trial court's award is within the range provided by these experts. Furthermore, the trial court stated in his Findings of Fact and Conclusions of Law that, relying upon the testimony presented (which included the effects of inflation and the present value of net lifetime earnings), he found the 6 percent awarded to be reasonable.
 
 
 61
 Mindful that "[t]here is no mathematical formula recognized in the jurisprudence of Mississippi to determine the amount of damages in a wrongful death action," and that the Mississippi Supreme Court does "not ordinarily disturb the findings of the trier of facts ... [unless] it appears from the evidence that the amount of the [award] bears no reasonable relation to the loss suffered and manifests a miscarriage of justice or is palpably against the weight of the evidence ...," Dickey v. Parham, supra, at 919, we do not find that the trial court's ultimate factual determination of the amount of damages is clearly erroneous.
 
 Verrett Funeral Expenses
 
 62
 The record reflects that the total burial expenses for Francisco Joseph Verrett amounted to $3,200.00. By inadvertence, however, the trial court only awarded $1,700.00 for this item of damages. During the oral argument of this case the United States agreed with plaintiff's counsel that the correct amount was that reflected by the record. We therefore modify the judgment in this regard, awarding plaintiffs Augusta Ida Verrett and Ann Guillory the amount of $3,200.00 for the burial expenses of Francisco Joseph Verrett. In all other respects the judgment of the district court is affirmed.
 
 
 63
 AFFIRMED AS MODIFIED.
 
 
 
 [1]
 The resolution stated:
 WHEREAS, on the 25th day of September, 1965, the President declared a "major disaster" in the State of Miss. under the provisions of Public Law 875, 81st Congress, as amended; and
 WHEREAS, Hancock Co. is a public entity within said State;
 NOW THEREFORE, Be It Resolved by Board of Supervisors of Hancock Co. that the Office of Emergency Planning be and hereby is requested to arrange to have the appropriate Federal Agency perform the following emergency work essential to the health, safety or welfare of the people and property of this public entity:
 Emergency repair to existing Seawall, and Debris clearance in connection with necessary repair of Sea Wall. Remove all debris which [constitutes] a health and safety hazard from Highway 90 in Bay St. Louis to the end of the seawall south of Waveland. This body certifies that, to the best of its knowledge and belief, the requested work is eligible under Public Law 875, 81st Congress, as amended, and agrees to (a) provide without cost to the United States all land, easements, and right-of-way necessary for accomplishment of the approved work; and (b) hold and save the United States free from damages due to the approved work.
 
 
 [2]
 The contract contained the following provision for the placement of warning signs:
 The Contractor shall mark the inner limits of the borrow area by means of piles with warning signs. The piles shall be pressure treated as specified hereinafter for timber piles, shall be 6 to 8 inches in minimum butt diameter, and shall be not less than 22 feet long. The piles shall be installed approximately 500 feet apart, in reasonable alignment, and with a penetration of approximately 8 feet. The piles shall be installed in water approximately 4 foot 6 inches and shall extend approximately 9 foot, 6 inches above the water. Each pile shall be provided with a warning sign. The warning signs shall face toward the shore. The sign shall be wood or metal, with two coats of white paint on each side and on the face side have the following sign in black letters not less than 3 inches high: "DEEP WATER TO SOUTH".
 
 
 [3]
 For reference to collected cases involving the discretionary function exception to the FTCA, see Annot., 65 A.L.R.Fed. 358 (1983)
 
 
 [4]
 Section 10 of the Rivers and Harbors Act of 1899 reads:
 Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 Mar. 3, 1899, c. 425, Sec. 10, 30 Stat. 1151.
 
 
 [5]
 The Mississippi Supreme Court's reference is to the Restatement (Second) of Conflict of Laws (Proposed Official Draft, Adopted May 24, 1968)
 
 
 [6]
 "The local law of the state where conduct and injury occurred has usually been applied to determine what items are includible in the damages [citing cases]. This law has likewise been applied to determine the method of computing damages [citing cases]." Restatement (Second) of Conflict of Laws Sec. 171, Reporter's Note at 512-13 (1971)