Louis F. MOCKLIN, Jr., et al.

v.

**The ORLEANS LEVEE DISTRICT and its Board of Levee Commissioners, et al.**

Civ. A. No. 88–1199

United States District Court, E.D. Louisiana.

July 18, 1988.

---

Lee, Martiny & Caracci, Dennis P. Couvillion, Metairie, La., for Louis F. Mocklin, Jr., Maria Ryan Mocklin.

Richard B. Ehret, McGlinchey, Stafford, Mintz, Cellini & Lang, P.C., Michael S. Guillory, New Orleans, La., for Orleans Levee Bd. & its Bd. of Levee Com'rs, Wayne Ducote, John Ross, Emile W. Schneider, George Talbot, Jr., Frank Uddo.

John Volz, U.S. Atty., Thomas L. Watson, Asst. U.S. Atty., New Orleans, La., for U.S. Army Corps of Engineers.

Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, David A. Olson, New Orleans, La., for Luhr Bros., Inc.

## ORDER AND REASONS

FELDMAN, District Judge.

Plaintiffs, Louis and Maria Mocklin, brought this action for damages arising out of the death of their young son. On the afternoon of July 17, 1986, eight-year-old Louis P. Mocklin and his seven-year-old brother, Patrick, were playing along a levee near Lake Ponchartrain in New Orleans. According to Patrick, Louis waded out approximately one hundred feet into the lake and then suddenly disappeared from sight. Louis's body was found by the police the next day in eight feet of water. He had drowned.

Louis's parents sued the Orleans Levee District and its Board of Commissioners and several other entities that were allegedly involved in work being done to the levee. The work was a part of a hurricane protection project undertaken by the Corps of Engineers and conducted by defendant Luhr Bros., Inc. under a contract between Luhr and the Corps. After the Levee Board impleaded the Corps, the plaintiffs amended their complaint to also include the Corps as a direct defendant. Both the plaintiffs and the Levee Board seek to recover from the Corps under the Federal Torts Claims Act. The Corps now moves for dismissal or, alternatively, for summary judgment on both the claims of the plaintiffs and the third-party claims of the Levee Board.

In its motion, the Corps asserts two theories of relief. First, the Corps contends that the allegedly actionable negligent acts were committed by others acting as independent contractors, not as Corps employees. Under this theory, the Corps asserts that none of the acts of these other parties may be imputed to the Corps. Second, the Corps argues that any negligent acts committed by the Corps itself are insulated under the discretionary function exception to the Federal Tort Claims Act.

By seeking recovery against the United States both on the basis of the so-called employee status of those who conducted the Lake Ponchartrain activities, and on the basis the Corps's own decisions regarding the manner in which the project was to be undertaken, the plaintiffs and the Levee Board, in effect, seek two bites at the apple.

*I. The Independent Contractor Defense*

It is settled doctrine that the United States cannot be held liable under the Federal Tort Claims Act for the negligence of its independent contractors. *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Cavazos v. United States,* 776 F.2d 1263, 1264 (5th Cir.1985); *Lathers v. Penguin Industries,* 687 F.2d

69, 72 (5th Cir.1982).[1] For the Government to be held liable under the Federal Tort Claims Act, the negligent person must be an "employee" as defined by the Act.[2] In *Cavazos*, the Fifth Circuit examined the standards governing application of the independent contractor defense. This defense underscores and is driven only by the control relationship between the contracting parties. The core of employee status under the Act finds its basis in "the power of the Federal Government 'to control the detailed physical performance of the contractor....'" 776 F.2d at 1264 (quoting *Orleans, supra*, 425 U.S. at 814, 96 S.Ct. at 1975–76). That a purported employee may receive federal funds or be subject to federal regulation is not sufficient. The test is far narrower. One seeking to overcome the independent contractor defense must show that the contractor's "day-to-day operations are supervised by the Federal Government." *Cavazos, supra*, 776 F.2d at 1264 (quoting *Orleans, supra*, 425 U.S. at 815, 96 S.Ct. at 1976). The Fifth Circuit calls this the test of "daily-detailed-control." 776 F.2d at 1264. The plaintiff and, in this case, the Levee Board, bear the burden of proving that the allegedly negligent contractor was an employee of the Government, not an independent contractor, within the meaning of the Act. *Duncan v. United States*, 562 F.Supp. 96, 99 (E.D.La.1983).

■ Not surprisingly, the contract itself is the starting point. In *Wood v. Standard Products Co.*, 671 F.2d 825 (5th Cir.1982), the Fifth Circuit said that, in applying the independent contractor defense, the Court must look first to the terms of the contract which fix the relationship between the Government and the contractor. *Id.* at 829. Under the hurricane protection contract, Luhr alone was responsible for complying with applicable regulations, providing safety mechanisms, and overseeing subcontractors. Luhr had operational control of the project area and was required to supervise its employees. The respondents claim that the contract gave the Corps the right to issue notices of deficiency with regard to the contractor's work and to stop the project if the contractor failed to comply with applicable safety standards. But the case law teaches that those perogatives simply do not equate with daily detailed control. *See Lathers v. Penguin Industries*, 687 F.2d 69, 73–74 (5th Cir.1982); *Alexander v. United States*, 605 F.2d 828, 834 (5th Cir.1979).

Furthermore, nothing in the facts of this case indicates that the Corps of Engineers in fact exercised greater authority over Luhr's daily operations than the prime contract contemplated. While the Corps's on-site investigator, Calvin Tozel, did occasionally give advice to the workers and warn trespassers to stay away from the site, he did not by any means exercise the kind of daily detailed control necessary to make Luhr and its personnel Government employees; indeed, he could be criticized for not acting as he did. The respondents also assert that Mr. Tozel was present at the project site during much of the time of the operations and, in fact, worked out of an office structure at the site. The argument is weak. Tozel's consistent presence does not alter the fact that the Corps of Engineers did not exercise daily detailed control over the project. *See Market Insurance Co. v. United States*, 415 F.2d 459, 464 (5th

---

1. In its memoranda, Luhr, the contractor and one of the defendants, argues that the claims of the Levee Board and the plaintiffs are solely based upon the negligence of the Government, through the Corps of Engineers, and not upon acts committed by Luhr Bros., for which the Government might be liable if the independent contractor exception does not apply. Neither the plaintiffs nor the Levee Board have so narrowed their theories of recovery against the Government. Accordingly, the Court will examine the applicability of both the independent contractor defense and the discretionary function exception.

2. "Employee" is defined to include:
   "officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty ..., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."
   28 U.S.C. § 2671 (1988 Supp.).

Cir.1969). The plaintiffs and the Levee Board have not established on this record that Luhr and its workers (and subcontractors) were Government employees during the course of the Lake Ponchartrain project. There are no material issues in dispute as to this issue. Thus, if the United States is to be held responsible for Louis Mocklin's death, the only theoretical basis for its responsibility can be the assertion of acts of direct negligence by the Corps of Engineers and its employees.[3]

## II. The Discretionary Function Exception

The employment of an independent contractor does not shield the Federal Government from liability for the negligent acts of its own employees. *Aretz v. United States*, 604 F.2d 417, 427 (5th Cir.1979). The direct negligence claims that are made against the Corps center on the detailed directions included in the prime contract regarding the method of completing the project. In particular, the Court is told, the Corps itself acted negligently in directing that flotation channels be constructed in otherwise shallow water so that equipment could be brought to the construction site. These flotation channels were created by dredging the lake bed, making deeper channels of water that could be used to bring in vessels with equipment for the project. The respondents add that the Corps was also negligent in not providing sufficient safety mechanisms, such as warning signs, to deter potential trespassers.

The Corps counters in response that it is immune from liability because its action in connection with the decision to direct the contractor to construct and maintain the flotation channels was subject to the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).[4]

The case literature which speaks to the discretionary function exception is neither a model of clarity or apparent consistency. In its most recent application of the exception, *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court refreshingly conceded that its interpretation of the Federal Tort Claims Act "has not followed a straight line." *Id.* at 811, 104 S.Ct. at 2763. The most prominent case on the discretionary function exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) and no analysis can start elsewhere. In *Dalehite* tort claims against the Federal Government were asserted because of the explosion of a ship laden with government-manufactured fertilizer in a Texas harbor. The blast leveled much of the city and killed several persons. The fertilizer had been manufactured by the United States government as a part of a wartime effort to bring food to several foreign countries. The district court found the Government to have been negligent in three distinct ways. First, the Government was negligent in drafting and adopting the fertilizer export plan as a whole. Second, the Government was negligent in several particular instances during the manufacture of the fertilizer. And, finally, the Government was found negligent in failing to police the loading of the transport vessel properly.

The case came to the Supreme Court from this Circuit. The Supreme Court started with the proposition that, while the Federal Tort Claims Act constitutes a statutory waiver of the United States's sovereign immunity in certain settings, "[i]t [does] not assure injured persons damages

---

3. This is precisely the analytical approach taken by the Fifth Circuit in *Alexander, supra.* 605 F.2d at 834. The parties seem at times to have confused the two arguments. Since the Court holds that the contractors were not employees of the United States as defined in 28 U.S.C. § 2671, the inquiry must now shift to whether the Government committed any independent acts of negligence.

4. That subsection provides that the Federal Tort Claims Act's waiver of sovereign immunity does not apply to:

"Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion be abused."

28 U.S.C. § 2680(a) (1982).

for all injuries caused by [the Government's negligence]." *Id.* at 17, 73 S.Ct. at 958–59. The Court first dismissed the argument that the decision to draft and adopt the export plan was not discretionary. *Id.* at 37–38, 73 S.Ct. at 969. It then faced the other two distinct claims of negligence. The Court held that both of these claims were protected by immunity under the discretionary function exception. The Court concluded, as to the negligence in the manufacturing process, that the actions complained of were "performed under the direction ... of plan-making authority from the apex of the Executive Department," *id.* at 39–40, 73 S.Ct. at 970, and that the individual choices made involved "serious judgment." *Id.* at 41, 73 S.Ct. at 0970–71. Drawing a distinction between decisions made and actions taken at the "planning" stage, as compared to actions taken at the "operational" stage, the Court found that all of the acts complained of were planning functions, and the discretionary function exception applied. *Id.* at 42, 73 S.Ct. at 971. As to the third category of negligence claims, dealing with failure to police the loading properly, the Court held that such decisions were "generally regarded as discretionary" because of their essentially legislative character. *Id.* at 43, 73 S.Ct. at 971–72.

Although some cases have subsequently sent mixed signals, *Dalehite* provides the backdrop for any discussion about immunity related to discretionary function. It has been said that later Supreme Court decisions eroded the *Dalehite* holding to some degree. *See, e.g., Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed. 2d 354 (1957) (allowing an action against the United States because of the national forest service's negligence in firefighting) (with two justices dissenting); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (allowing recovery against United States because of negligence in the operation of a lighthouse) (with four justices dissenting). Notwithstanding those cases, the Supreme Court's unanimous opinion in *Varig*, the Court's most recent opinion on the exception, is a strong re-affirmation of *Dalehite*. The

*Varig* Court refused to accept the notion that "*Dalehite* no longer represents a valid interpretation of the [exception]." 467 U.S. at 811–12, 104 S.Ct. at 2763.

*Dalehite* clearly comprehends the application of the discretionary function exception in the present case. Nonetheless, the respondents argue that, under the Fifth Circuit's glosses on the exception, the Government is not immune because the Fifth Circuit has modified the planning/operation distinction recognized in *Dalehite*.

Several cases require comment.

In its most recent decision, *Denham v. United States*, 834 F.2d 518 (5th Cir.1987), the Corps of Engineers was charged with the maintenance of a swimming area in a federally owned and operated park. The plaintiff was injured when he dove into the water and struck his head on an abandoned concrete anchor. The district court found that the Corps should have known of the presence of the anchor, but had made no attempt to remove it. The Fifth Circuit affirmed the district court's decision that the Corps was not immune from the plaintiff's suit. Applying the planning-operational test, the Fifth Circuit distinguished between the Corps's initial decision to operate the swimming area, which was clearly discretionary, and the subsequent failure to inspect the area for submerged objects. The court held that the subsequent decision was not protected by the exception: "The Corps here was performing an operational function, and it did not have the discretion to do so negligently." *Id.* at 521. The Fifth Circuit also noted that the Corps had created the danger "after the critical discretionary decision had been made." *Id.* But the role of the Corps in *Denham* was to operate the area; the Corps had direct operational responsibilities.

The Fifth Circuit reached a similar conclusion in *Butler v. United States*, 726 F.2d 1057 (5th Cir.1984). In *Butler*, the plaintiff's son drowned when he waded into an unmarked off-shore depression created by a Corps of Engineers contractor during work to repair a seawall. In the contract, the Corps had specified the location of dredging to be done to provide sand to

surround the seawall. The dredging took place in an area just offshore from a popular beach. The Corps had also specified requirements for the placement of warning signs for the dredged areas. The court found that the Corps closely supervised the operations throughout the term of the contract. *Id.* at 1059–60. Furthermore, prior to the drowning of the plaintiff's son, several other people had drowned because of the improperly marked depression. *Id.* at 1060. Despite the Corps's repeated assertions that it had exclusive jurisdiction over the area of the depression, no steps were taken to remedy the danger until after the drowning of the plaintiff's son. *Id.* at 1060–61.

*Butler* was decided prior to *Varig,* and the Fifth Circuit emphasized what it saw as the consistent narrowing of the discretionary function exception in the years between *Dalehite* and *Varig.* Nonetheless, the analysis that the *Butler* court undertook was essentially the same as that used in *Denham.* The *Butler* court noted that the critical discretionary decision made by the Corps of Engineers was the decision to repair the seawall. The court held that after this initial decision was made, the discretionary function exception no longer applied to shield the Corps from liability for negligence in the operational phase of its activities.[5] But again, the Corps had operational responsibilities.

In *Wysinger v. United States,* 784 F.2d 1252 (5th Cir.1986), the Fifth Circuit reached an opposite conclusion. In *Wysinger,* the plaintiff's son had drowned in a swimming area created by the Forest Service (an agency of the Department of Agriculture). The Forest Service had not maintained a lifeguard at the site of the accident for several years and, in fact, had placed a sign informing visitors that there was no lifeguard on duty. The plaintiff maintained that the Forest Service had

been negligent in failing to follow its own regulations which allegedly required a lifeguard in the area. The *Wysinger* court relied upon *Dalehite* and *Varig,* and said of *Indian Towing* and *Rayonier:*

> "These cases ... stand only for the proposition that once the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out."

784 F.2d at 1253. The court held that applicable regulations required the Forest Service to make an initial determination as to whether a lifeguard was necessary at the swimming site. In the exercise of its discretion, the Service decided that the lifeguard was not necessary. *Id.* at 1254. The court noted, however, that if the Forest Service had employed a lifeguard who acted negligently, recovery under the Federal Tort Claims Act would be permitted.

Similarly, in *Wiggins v. United States,* 799 F.2d 962 (5th Cir.1986), a case decided only months after *Wysinger,* the Fifth Circuit applied the discretionary function exception to bar an action against the Government.[6] In *Wiggins,* the plaintiff's husband was killed when his boat struck a submerged piling in Louisiana's Flat Lake. The court found that the Corps of Engineers had made a determination that the pilings did not pose a sufficient hazard to navigation in the lake to outweigh the cost of their removal. *Id.* at 963–64 (quoting *Wiggins v. United States,* No. 85–1235, slip op. (E.D.La.1985)). The Fifth Circuit distinguished *Wiggins* from *Butler* and other cases holding the United States liable, noting that the decision not to remove the pilings was a discretionary decision made by the Corps of Engineers on the basis of economic considerations. *Id.* at 967.

---

**5.** A similar conclusion was reached in *Seaboard Coast Line Railroad Co. v. United States,* 473 F.2d 714 (1973). In that case, the Fifth Circuit refused to apply the discretionary function exception to shield the Government from liability for damages caused by the negligent design of a drainage ditch built in connection with a federal aircraft maintenance facility.

**6.** *Wiggins* was decided under the Suits in Admiralty Act, 46 U.S.C. § 741, *et seq.* The court, nonetheless, looked to case law interpreting the discretionary function exception to the Federal Tort Claims Act as applicable precedent. *See* 799 F.2d at 964–66.

The Fifth Circuit's distinction between intial discretionary decisions and subsequent operational actions presents a somewhat ill-defined line between cases in which the discretionary function exception applies and cases in which it does not apply. It also seems conceptually at odds with an observation the Supreme Court made in *Dalehite* about insulating the operational acts of subordinates who carry out the discretionary decisions taken:

"[T]he 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. *It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.*"

*Dalehite, supra,* 346 U.S. at 35–36, 73 S.Ct. at 968 (emphasis added) (footnote omitted). Nonetheless, such is the environment in which this Court must address the present motion. The respondents echo *Denham* and *Butler* and argue that, while the Corps's decision to undertake the Lake Ponchartrain project was discretionary in nature, the instructions in the contract as to how the project should be undertaken are in the nature of operational decisions. This Court disagrees. They implement policy only; they are adjectival to and intimate with policy discretion and decision. The Court finds that under the Fifth Circuit's case law and, even more clearly, under *Dalehite* and *Varig,* the United States is immune from liability for the unfortunate death of the plaintiff's son.

Considering the Court's conclusion that the activities authorized in the contract were carried out by an independent contractor and not by employees of the Corps, the only action that the plaintiffs and the Levee Board can attack as direct negligence is the Corps's decision, expressed in the contract, to use flotation channels to access the operation sites. By the terms of the contract, the contractor, Luhr, was responsible for taking safety measures such as the placement of warning signs and the like. The decision to use flotation channels is discussed in the Corps's Project Authorization for the Lake Ponchartrain project. That document states:

"Flotation channel plan. All material for the construction of the foreshore protection dike would be barged in and unloaded at four mobilization sites. [The sites are identified] The perpendicular flotation access channels and the construction of mobilization sites (unloading pads) have eliminated the removal of about 120 shoreline campsites that would otherwise be displaced, if a parallel flotation channel were to be used."

Directions for the excavation of flotation channels are also contained in the contract at Section 2–4. The Project Authorization's discussion of flotation channels demonstrates that the decision to employ flotation channels at particular locations and of stated dimensions was made after the Corps considered competing policy objectives and was an integral part of the Corps's plan for carrying out the project. They are all obvious policy decisions taken in the exercise of agency discretion. The claims of negligence against the Corps in the present case, then, are qualitatively different from the claims made in *Denham* and *Butler.* Those cases involved negligence in the Corps's actual operation of on-going projects. The decision not to mark the depressed area in *Butler* was not the result of any policy-oriented planning. Similarly, the decision not to search the swimming area in *Denham* for submerged objects was not a part of any identifiable policy.

The Corps of Engineers is insulated from any negligence which might have occurred in this case. The Corps's only decision was to use flotation channels of certain specifications and locations to bring equipment to the construction site. The responsibility for taking steps to insure the safety of the project, including the placement of warning

**534**

signs, belonged to the Corps's contractor.[7] *Wysinger* and *Wiggins* teach that governmental determinations which are rooted in policy considerations are immune from tort liability. The decision to use certain specified flotation channels in this case was just such a policy matter. Not only is this conclusion informed by Fifth Circuit caselaw, it is compelled by the Supreme Court's decision in *Dalehite.* Any other conclusion would emasculate the Corps of Engineers's ability to make sensitive policy decisions regarding the protection and development of navigable waterways.[8] And that is the very goal of *Dalehite.* Speaking generally of the discretion that Congress sought to protect through the discretionary function exception, the Court noted:

> "One only need read § 2680 in its entirety to conclude that Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions."

346 U.S. at 32, 73 S.Ct. at 966.

### III. Propriety of Summary Judgment

No material facts are in dispute bearing on the issue of the liability of the Corps of Engineers. Both the plaintiffs and the Levee Board refer generally to issues which should be determined by the trier of fact, but they do not produce any material to support their claims of unresolved factual issues. Under the facts presented to the Court, the Government is entitled to summary judgment in its favor as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985); *Fontenot v. Upjohn Co.,* 780 F.2d 1190 (5th Cir.1986). Since the independent contractor defense and the discretionary function exception apply to immunize the United States from any liability in this action, this Court has no subject matter jurisdiction over the claims against the Government. *See Wysinger, supra,* 784 F.2d at 1254.[9]

Accordingly, for the foregoing reasons, the motion by the United States Army Corps of Engineers for summary judgment is GRANTED.

---

7. In *Butler, supra,* on the other hand, the Corps took responsibility for attempting to fill in the depressed areas created by the dredging activities. The court found that this attempt actually worsened the danger created by the dredging. 726 F.2d at 1060–61. In that case, the Corps went so far as to claim exclusive responsibility for the dredging area, and steadfastly refused to fill in the area or post warnings.

8. Much like the fertilizer export project in *Dalehite* was undertaken pursuant to a delegation of authority from the "apex of the Executive Department," *see supra* p. ——, the authority for the Lake Ponchartrain project came from an act of Congress. *See* Act of October 27, 1965, 89 Stat. 298 (1965).

9. Because of this Court's determination that it has no subject matter jurisdiction over the claims against the Corps of Engineers, it is unnecessary to address the Government's contention that, by naming the Corps, itself, instead of the United States, as a defendant/third-party defendant, the plaintiff and the Levee Board failed to sue the proper party under the Federal Tort Claim Act.